Nicholas **TRUSELO** D.O.B.: 6/1/2000.

**Division of Family Services Petitioner,**

v.

**Tina M. Carroll Ralph J. Truselo Respondents.**

**No. CN00–09299.**

Family Court of Delaware.
New Castle County.

Submitted: Sept. 11, 2000.
Decided: Sept. 19, 2000.

---

Jan R. Jurden, Wilmington, Delaware, for Loreto P. Rufo, Attorney Guardian Ad Litem for Nicholas Truselo.

Joelle P. Hitch, Wilmington, Delaware, for the Division of Family Services.

Kathryn J. Laffey, Wilmington, Delaware, for respondent, Tina M. Carroll.

Michael W. Arrington, Dover, Delaware, for respondent, Ralph J. Truselo.

ABLEMAN, J.

## I. INTRODUCTION

This case comes before the Family Court for consideration of the Attorney Guardian Ad Litem's motion on behalf of a minor child, Nicholas Truselo, born 6/1/00, who is in the custody and care of the State of Delaware Division of Family Services ("DFS"). The motion seeks an Order directing medical providers of the child to de-escalate medical intervention and place a "do not resuscitate" ("DNR") Order, with comfort measures, on the child's medical chart. An evidentiary hearing was held on September 7, 2000, and supplemental testimony taken on September 11, 2000. This is the Court's Decision and Order granting the relief sought by the Guardian.[1]

---

1. The Court wishes to express its gratitude to the attorneys who participated in this case on a pro bono, expedited basis. Jan Jurden, Esquire, Kathryn Laffey, Esquire, and Michael Arrington, Esquire, provided capable

## II. STATEMENT OF FACTS

The infant who is the central figure in this tragic case is Nicholas Truselo, who was born on June 1, 2000. His mother, Tina Carroll ("Mother"), and alleged father, Ralph Truselo ("Father"), are parties to this litigation. At the time of his birth, Nicholas was a normal healthy baby who was released from the hospital to the care of his mother. Today, as a consequence of an incident that occurred when he was just over two months old, Nicholas exists in the intensive care unit of the DuPont Hospital for Children, suffering from a traumatic brain injury that has rendered him bedridden for life, and dependent on others for the rest of his life. He is unable to see, hear, or eat, and in the future, will be unable to sit, walk, stand, or speak. He is without any cognitive brain function. His condition is permanent and irreversible and his life is being sustained only through the use of extraordinary, life-prolonging measures. He lies in a crib with a large drainage tube inserted in his skull, an endotrachial tube through his mouth to his lungs, hooked to a mechanical ventilator to maintain his breathing, and a naso-gastric tube inserted through his nose to provide him with nourishment. He possesses no choke or gag reflexes and is responsive only to painful stimuli. It is highly unlikely that his condition will ever improve. In the final analysis, this case involves the life and painful death of a three-month-old infant and the responsibilities, rights, and duties of family, Guardian, doctors, and the Court, regarding the inevitable and difficult decisions concerning this child.

According to the record, upon his release from the hospital following his birth on June 1, 2000, Nicholas lived initially with his natural mother. She was responsible for his care until approximately August 15, 2000, at which time the State Division of Family Services sought and obtained an *ex parte* Order of custody of the child upon the filing of a Dependency/Neglect Petition in the Family Court. The petition alleged that the child's mother "is currently at the Rockford Center [a psychiatric facility] and that three days earlier, on August 12, 2000, she had been taken to the Delaware State Hospital for cutting her throat." It was further alleged that Mother was intoxicated at the time. The child had been staying with the paternal grandmother in the home of Father's paramour. Father was incarcerated on a Violation of Probation charge for which he received a sixty-day sentence. The petition further asserted that Father's paramour did not feel capable of caring for Nicholas, and that the paternal grandmother did not have stable housing, thereby preventing her from taking responsibility for her grandson.

The Court's August 15, 2000, *ex parte* Order, entered pursuant to Family Court Civil Rule 200(d), granted temporary custody of Nicholas to the Division, based on the Court's finding that "there is an immediate threat to [his] health and safety . . ., due to the fact that serious physical abuse to the child or another member of the child's household has previously occurred or been threatened, or there is the likelihood of it occurring or reoccurring to the child or a member of the child's household;" and "there is a threat of immediate harm to the child due to the deprivation of food, shelter or medical attention . . .".

The child was immediately placed in a DFS foster home. In accordance with

representation to the parties and significant service to the Court.

The Court is particularly grateful to the Attorney Guardian Ad Litem, Loreto Rufo, Esquire, for his exemplary service, time, and commitment to this child.

Family Court procedures in dependency/neglect cases, a probable cause hearing was promptly scheduled to be held on August 24, 2000. Only days prior to the scheduled hearing, the child was taken by ambulance to the Christiana Hospital. He was not breathing and had no pulses. The initial CAT scan of his brain performed at Christiana showed bilateral subdural hematomas. Because the admitting physician was highly suspicious of inflicted brain injury, Dr. Alan DeJong, the medical director of the CARE ("Children At Risk Evaluation") team at the DuPont Hospital for Children, was consulted. Upon examination at the DuPont Hospital, Dr. DeJong concluded that the child was a victim of inflicted head trauma, or shaken baby impact syndrome. Thus, even prior to the first hearing in this Court, the child's life had been permanently and unalterably devastated.

Following the probable cause hearing before a Commissioner on August 24, 2000, the Court determined that the child continued to be in actual physical, mental or emotional danger, or there was a substantial risk thereof, in accordance with Family Court Civil Rule 202. By this time, both parents were incarcerated. The Court continued custody with DFS, scheduled an adjudicatory hearing for September 18, 2000, and specified that if petitions for custody were filed by either or both of the child's grandmothers, that these should be consolidated for the adjudicatory hearing. At the adjudicatory hearing, the Court would determine, by a preponderance of the evidence, whether the child is dependent or neglected and whether it is in his best interests to remain in DFS custody.[2]

Immediately following the probable cause hearing, the Commissioner referred the case to the Office of the Child Advocate for appointment of a Guardian. The Court entered an Order appointing Loreto P. Rufo, Esquire, as Attorney Guardian Ad Litem for Nicholas pursuant to 10 *Del.C.* § 925(17) and 13 *Del.C.* § 701(c), with all of the duties, rights, and responsibilities set forth in 29 *Del.C.* § 9007A(3).

By the following week, the child's condition showed no signs of improvement, and his prognosis was so dire that hospital personnel began to discuss with the Guardian the prospect of de-escalating medical intervention, and placing "Do Not Re-Intubate" and "Do Not Resuscitate" orders on the child's chart. The Guardian, together with the physicians, began the difficult and painful process of discussing the options with the parents. After the Court was alerted to the possibility that the Guardian may file for such relief, counsel was appointed to represent each of the parents. Counsel was also appointed to represent the Guardian.

On September 1, 2000, counsel for the Guardian wrote a letter advising the Court that Nicholas' condition had "taken a turn for the worse." A request was made to conduct an adjudicatory hearing earlier than the scheduled date. Following a conference with counsel on September 6, 2000, the instant motion was filed by the Attorney Guardian Ad Litem. That motion, together with the Rule 203 adjudicatory hearing, were consolidated for evidentiary hearing the following day.

Prior to the hearing, the parties stipulated that the child is a "dependent child" as defined by 10 *Del.C.* § 901(8). The parties further stipulated that it is in the best interests of Nicholas as to be in the custody of the Division of Family Services pursuant to 13 *Del.C.* § 722.

Evidence at the hearing on the Guardian's motion consisted of the testimony of

**2.** 13 *Del.C.* § 721(e); Family Court Civil Procedure Rule 203.

physicians who have examined and treated Nicholas since his admission to the DuPont Hospital and the observations and experiences of the child's Attorney Guardian Ad Litem since his appointment on August 24, 2000. In addition, the Court confirmed that both parents support the Guardian's request to remove the ventilator and place a DNR order on Nicholas' chart, that both were fully informed of the treatment options and their consequences, and that both parents fully understood the choices. These witnesses painted a somber and dismal picture of this young infant's prospects, so much so that emotional reaction to the testimony in the Courtroom was manifest.

Nicholas' condition was described in detail by Dr. Scott Penfil, a pediatric critical care physician, who is one of five doctors in the "call group" assigned to this child's case. His first examination took place on August 31, 2000. Dr. Penfil described the child as the victim of a traumatic brain injury resulting from shaking ("shaken baby impact syndrome") who had also sustained additional brain damage as a result of a hypoxic brain injury caused by a lack of oxygen to the brain. At the time of his initial examination, the child had an endotrachial tube in place that was connected to a ventilator. He was being fed by a nasogastric tube. An intravenous line provided two medications that were being administered to control seizure activity. It was unclear to the doctor whether Nicholas could breathe on his own. The child was difficult to arouse and did not open his eyes at all. It was believed that he could not sustain himself without the breathing machine.

Dr. Penfil's examination also revealed evidence of a loss of reflexes from the brain stem, the portion of the brain that controls the most primitive reflexes. The child has no corneal reflex, which is indicative of injury to the brain stem itself. Since that area of the brain is the most resistant to injury, he is certain that there is more severe damage to the cortex of the brain, which portion controls all of the child's cognitive functions.

According to Dr. Penfil, one of the most serious concerns is the child's lack of a gag or cough reflex. In a healthy individual, there is a strong respiratory drive to breathe and an ability to protect the airway. Nicholas is unable to handle his own secretions, a condition that will ultimately result in progressive lung disease. Presently, Nicholas' respirations are controlled and provided to him through the use of an endotrachial tube inserted through his mouth and attached to a mechanical ventilator. Secretions are manually removed by nursing personnel through suction equipment.

Dr. Penfil examined the child the following day and several times thereafter but could find no evidence of significant improvement. Although Nicholas had a stronger respiratory pattern, there was no improvement in his gag or corneal reflexes. He opened his eyes and was responsive only to painful stimuli, and his responses were abnormal. Instead of withdrawal from pain, Nicholas responds by posturing and arching his back. Ultimately, he will assume this position permanently unless he has intensive physical therapy intervention. This type of response indicates significant brain injury, which will worsen with time.

The quality of life this child will face, according to Dr. Penfil, is extremely poor. If he lives, he will need constant care, will never be independent, and will suffer recurrent pulmonary infections. It is extremely unlikely that he will ever walk or speak, and he will most likely be blind. He will never eat or communicate, and

there will be no improvement in his cognitive status.

The options presented by Dr. Penfil ranged from a "full court press," whereby the doctors would do everything to prolong the child's life, to no active intervention or heroic measures, with medication to make sure he is not in pain. The third option is actually a follow-up to the "no heroic measures", in that, if the child's heart does not slow down, a gastrostomy tube would be inserted to give liquid and nutrition. This procedure involves the surgical insertion of a feeding tube directly into the stomach through the abdomen. Liquid nourishment would be delivered through the external portion of the tube. When questioned directly, Dr. Penfil agreed with the Guardian Ad Litem and the parents, that it is in Nicholas' best interest to discontinue the ventilator, remove the endotrachial tube, and "let nature take its course."

The sobering prognosis for this child was echoed by Dr. Alan DeJong, a full-time board certified pediatrician with a special interest in child abuse and neglect. In fact, Dr. DeJong is highly respected and recognized by those in the child advocacy community in this area as an expert in this field, which includes expertise with children who have sustained severe inflicted brain injuries.

Dr. DeJong first examined Nicholas on the afternoon of August 23, 2000 when he was transferred to the DuPont Hospital for Children. The child was on a ventilator and only minimally responsive. At the time there were signs of active seizure activity. The persistent seizures are significant if they continue more than a few minutes after the injury as they are symptomatic of diffuse brain injury. Dr. DeJong also found bilateral multiple retinal vitreous hemorrhages, strongly indicative of inflicted head trauma.

The prognosis formulated by Dr. DeJong on August 23, 2000, which has not improved upon subsequent examinations, was described as "rather bleak," based upon a number of factors. Those factors include the fact that the child was in a coma when first brought to the hospital, had no gag or cough reflexes, and no pulses or respiration upon the paramedics' arrival. He had only minimal response to stimuli and persistent seizure activity at least 24 hours after the injury. Nicholas has not improved neurologically to any significant extent. Rather, there have been clinical signs of severe brain injury, such as "arching", i.e. the posturing of the body into a curve, which may worsen into a more permanent arched position that will cause discomfort.

Although Dr. DeJong was not able to predict the degree of the child's discomfort, he too was quite pessimistic with respect to the quality of life that the child could expect. Dr. DeJong testified that the child will require 24–hour continual care, will not be able to do anything for himself, and will never be aware of his surroundings. He will need a tracheostomy to survive long-term and a permanent gastrostomy tube for nourishment as feeding by mouth will forever be out of the question. He will never walk, see, or hear. In Dr. DeJong's medical opinion, it is not in this child's best interests for the physicians to employ heroic measures to keep him alive. He opined that the child should be given comfort measures and that the ventilator should be disconnected.

Dr. Charles Bean, a board certified pediatric neurologist, who is not a paid employee of DuPont Hospital for Children, provided an independent opinion regarding the child's diagnosis, treatment, and prognosis. Dr. Bean is a clinical associate professor on staff at Jefferson Hospital in Philadelphia and is an expert in "Shaken

Baby Impact Syndrome", as he has evaluated numerous children afflicted with this injury. He examined Nicholas on September 9, 2000, and reviewed the child's medical records. Dr. Bean concurred with Drs. Penfil and DeJong regarding their diagnosis, and added that the symptomotology is consistent not only with violent shaking of the child, but also with a traumatic impact, such as throwing the child, causing blunt trauma to the head. This, in turn, caused a concussion, which then precipitated hypoxia or insufficient oxygen to the brain. It is the combination of these two forms of injuries that resulted in the child's severe and devastating injuries. Dr. Bean added that, even with the most severe forms of neurological impairment, some progress will most likely occur. For example, Nicholas may be aware of sounds, appreciate touch, and even develop minimal sight.

Notwithstanding any improvements, should he survive, Nicholas will be profoundly retarded, require total care, and will never be independent in any sense of the word. In light of this evaluation, and considering the parties' request, Dr. Bean testified that, in his medical opinion, it is in Nicholas' best interests to prescribe a "Do Not Resuscitate/Do Not Re–Intubate" order. He further recommended that infections should not be treated.

### III. ISSUES PRESENTED

It is against this profoundly sad description of this infant's grim prospects for a normal life that this Court has been invoked to aid the parents, the Guardian Ad Litem, the physicians, and the hospital staff, in implementing their decision about what is best for this child.

In so doing, the Court must initially resolve the following questions: [3]

1. Does the Delaware Family Court have jurisdiction to decide whether extraordinary medical measures can be ceased and a DNR Order placed on the medical chart of a dependent child in the care and custody of the State Division of Family Services?

2. Does the Delaware Family Court have authority to decide whether to terminate life support measures and direct the placement of a DNR Order on the chart of a dependent child, where the parents, Guardian Ad Litem, and hospital personnel concur with such an Order.

3. What standard should be applied to the Family Court's determination of whether to enter an Order to terminate life support measures and enter a DNR Order on the medical chart of a dependent child in DFS custody?

4. What evidentiary standard must the Family Court apply in determining if it is in the best interests of a child in DFS custody for life support measures to be terminated and for a DNR Order placed on his chart?

### IV. DISCUSSION

#### A. *Jurisdiction of the Family Court*

I turn first to the question of whether the Delaware Family Court has jurisdiction to determine whether life support measures can be terminated and a Do Not Resuscitate Order can be placed on the medical chart of a child in the custody of the State Division of Family Services. A related issue is whether the Delaware Family Court has the authority to decide these questions, and if so, when and

---

**3.** In framing the issues for decision in this case, the Court is indebted to Tania Culley, Esquire, the Child Advocate, who provided the Court with an extremely thorough amicus brief with extensive supportive case law, on very short notice. This was of immeasurable assistance to the Family Court in this decision.

whether that authority should be exercised under the circumstances of this case.

Although all of the parties and interested participants agree that the Delaware Family Court has statutory jurisdiction over this child, and that such jurisdiction extends to judicial consent to medical care, it is important to examine the basis for this conclusion. Should this Court determine to exercise its power, the consequences are final. Moreover, although there exists Delaware Chancery Court precedent to enter DNR Orders in the case of adults, this is a case of first impression insofar as the decision involves an infant in the care and custody of the State.

By statute, the Family Court of the State of Delaware, upon the petition of any person, may commit a child to the custody of the Division of Family Services if that child is alleged to be dependent or neglected.[4] That jurisdiction includes judicial consent to medical care and treatment of a child.[5] The Delaware Chancery Court has upheld the right of a guardian of an incompetent adult, in appropriate circumstances, "to make choices declining medical care for the ward that others may regard as necessary or appropriate."[6] The Courts have reasoned that, if competent persons have the right to forego medical treatment and allow the natural processes of death to follow their inevitable course, these rights are not lost merely because a patient is incompetent.[7]

Although this issue is one of first impression for the Delaware Family Court, as these questions have heretofore been presented to the state's court of general equity, the Family Court's jurisdiction to determine medical care and treatment of a child in the custody of the State was implicitly acknowledged by the Delaware Supreme Court in the case of *Newmark v. Williams*.[8] Though the issue presented in that case did not involve the precise question of terminating life support measures, the decision is significant in that the Delaware Supreme Court did not question the Family Court's jurisdiction to decide the type of medical care a child should receive. Moreover, the Court defined medical care to include the right to de-escalate, or decline, medical treatment.

In *Newmark*, the Delaware Supreme Court was asked to review a decision of the Family Court that awarded custody of a three-year-old child, who was suffering from a deadly, aggressive, and advanced form of pediatric cancer to the State's child protective agency, solely on the basis of the fact that the child's parents, who were Christian Scientists, rejected chemotherapy treatment in favor of a course of spiritual aid and prayer. In order to receive the radical form of chemotherapy prescribed by the child's oncologist, the Court found that the child was a "neglected child" by virtue of the fact that his

4. 10 *Del.C.* §§ 921(1) and 902.

5. 10 *Del.C.* § 921(4); 13 *Del.C.* § 707(b); *Newmark v. Williams*, Del.Supr., 588 A.2d 1108 (1991).

6. *In re Rick*, Del.Ch., 1996 WL 361526, Allen, C. (June 10, 1996); *Severns v. Wilmington Medical Center*, Del.Supr., 421 A.2d 1334 (1980); *In the Matter of Tavel*, Del.Supr., 661.A.2d 1061 (1995).

7. *In re Rick*, 1996 WL 361526; *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 664 (1976); *In re*

*K.I., B.I.,* and *D.M.*, D.C. Ct.App., 735 A.2d 448, 460 (1999); See also: *In re Conroy*, 98 N.J. 321, 486 A.2d 1209, 1229 (1985) (stating that individuals, such as infants, mentally retarded people, and permanently comatose persons, retain their right to self-determination, even though they are unable to speak for themselves on life and death issues concerning their medical care).

8. Del.Supr., 588 A.2d 1108 (1991).

parents refused to accede to the demands of the medical professionals.

In reversing the decision of the Family Court, the Delaware Supreme Court did not challenge the trial court's jurisdiction to reach a conclusion on this issue, but merely disagreed with its conclusion, holding that the Family Court did not explicitly consider the competing interests at stake, including the autonomy of parental decision-making authority over minor children, the gravity of the child's illness in conjunction with the invasiveness of the proposed treatment, and the considerable likelihood of failure. In so doing, the Supreme Court returned custody of the child to his parents, thereby approving the right of parents "at some point to reject medical treatment for their child." [9]

While the *Newmark* case did not squarely face the issue of the Family Court's jurisdiction to forego heroic treatment measures, or to enter DNR orders on the chart of a child in DFS care, it clearly provides precedent for this Court to decline or to de-escalate treatment, as well as for the Family Court to approve of such a course of action.[10]

■ To the extent that Delaware authority is not directly on point, Juvenile, Probate, and Family Courts in other jurisdictions have considered these questions and have held that the empowerment to determine medical care of a child includes the Court's power to enter Orders terminating those procedures.[11] The mandate of juvenile courts to act in furtherance of the child's welfare provides the authority to make medical care decisions, including the entry of a DNR Order, where the child is in the custody of the state.[12]

The Massachusetts Supreme Court's discussion of the jurisdictional issue in the *Custody of a Minor* case is particularly relevant to the extent of the Delaware Family Court's jurisdiction. The Juvenile Court that entered such an Order in Massachusetts was, like Delaware's Family Court, a statutory court, and not the State's court of general equity jurisdiction. Reasoning that its Juvenile Court is the proper tribunal in which to carry out the State's policy to provide substitute parental care and protection of dependent children, the Court stated as follows:

> [T]he Juvenile Courts have a broad mandate to act in furtherance of a child's welfare and the fact that Juvenile Courts are not courts of general equity jurisdiction "is of no particular relevance to the question of the proper exercise of their powers under the statutes granting jurisdiction to these courts as to matters involving juveniles." *Police Commissioner of Boston v. Municipal Court of the Dorchester Dist.*, 374 Mass. 640, 666–

---

9. *Newmark*, 588 A.2d at 1120.

10. In *Newmark*, where the parents' view of the best course of treatment differed from that of the treating physicians, the trial court's role was simply to designate a custodian for the child for the purpose of making medical decisions. While it could be said that the Court thereby did not specifically order certain treatment, in essence, the Court's choice of a decision-maker was tantamount to the choice of what type of treatment would be administered to the child.

11. *In re C.A.*, 236 Ill.App.3d 594, 177 Ill.Dec. 797, 603 N.E.2d 1171, 1178 (1992) (the Juvenile Court Act provides Judges with authority to consent to the placement of a DNR Order on a minor ward's medical chart); *Custody of a Minor*, 385 Mass. 697, 434 N.E.2d 601, 605 (1982) (the decision to withhold a particular course of medical treatment for a child in the care of a welfare agency is properly within the jurisdiction of the juvenile court, a statutory court charged with the care and protection of dependent children).

12. *In re C.A.*, 177 Ill.Dec. 797, 603 N.E.2d at 1178.

667, 374 N.E.2d 272 (1978). The statutory "grant of jurisdiction carries with it by implication power to use the necessary means to exercise and enforce that jurisdiction." Id. at 663, 374 N.E.2d 272 quoting from *Commonwealth v. New York Cent. & H.R. R.R.*, 206 Mass. 417, 429, 92 N.E. 766 (1910).

Similarly, the Illinois Appellate Court in *In re C.A.* held that the Illinois Juvenile Court Act provided statutory jurisdiction to the Juvenile Court Judges to enter orders affecting a ward's medical treatment, including the entry of a DNR Order. The Court reasoned, as did the Massachusetts Court, that the juvenile court was charged with all matters presented to it regarding the welfare of the child, and that the Juvenile Court Act required court review of matters affecting the ward on a regular basis. That Court concluded:

> Our juvenile court is charged with implementing its legislative mandate to care for those minors found to be in need of the State's protection. We believe that the court acted properly in hearing the petition and in concluding that C.A.'s guardian could consent to the placement of a DNR order on her charts under certain conditions.[13]

■ The Delaware Family Court, like the juvenile courts in Illinois and Massachusetts, is a statutory court charged with protecting the safety and well-being of a dependent or neglected child.[14] This mandate necessarily includes medical treatment decisions on behalf of a child in State care, including those decisions that result in declining or foregoing such treatment, when it is appropriate to do so.[15]

Moreover, I do not interpret the provision in Delaware's statute that refers to the Court's jurisdiction to consent to "medical care and treatment of a child" to be distinguished from the Court's authority to consent to termination of medical treatment. While a literal dictionary definition might appear to exclude the authority to consent to termination, "[a] decision to terminate life support systems, however, transcends dictionary definitions."[16] The Washington Court in *In re Hamlin* properly recognized its duty to provide guidance to those who must directly face termination decisions, even in the absence of an applicable statutory procedure, or explicit statutory language defining de-escalation of treatment decisions.

■ Based upon the foregoing statutory and decisional authority, I am satisfied, as are all of the parties in this litigation, that the Delaware Family Court Act grants jurisdiction to the Court to consent to medical decisions regarding Nicholas, and that such decisions may encompass the entry of a Do Not Resuscitate Order on the child's chart, as well as the de-escalation of life support measures.

### B. The Court's Authority to Enter a DNR Order When All Parties Agree

Perhaps the most difficult question in cases involving such life and death issues, is whether the Court has authority to decide to terminate life support measures, and if so, whether it should exercise that power. In defining the circumstances in which life-sustaining medical treatments may be withheld from a patient, the Courts assume a difficult role, one that

---

13. *In Re C.A.*, 177 Ill.Dec. 797, 603 N.E.2d at 1178.

14. 10 *Del.C.* § 1009(a).

15. 10 *Del.C.* § 921(4); *Newmark*, 588 A.2d 1108.

16. *In re Hamlin*, 102 Wash.2d 810, 689 P.2d 1372, 1375 (1984).

strongly implicates moral and social values. It is not surprising, then, that Judges have been, and continue to be, reluctant to intervene in decisions that formerly were within the exclusive domain of patients, parents, doctors, and hospitals.

As a general principle, parents enjoy a well-established legal right to make decisions for their children,[17] including authorization for medical treatment. Parents have a "high duty" to recognize symptoms of illness and to seek and follow medical advice for their children.[18] Because the parental right is a sacred one,[19] Courts have traditionally given great deference to parental decisions involving minor children.[20] In most circumstances, "the State is simply not an adequate surrogate for the judgment of a loving, nurturing parent."[21] The United States Supreme Court has acknowledged the fact that "natural bonds of affection lead parents to act in the best interests of their children."[22] Since parents, in normal circumstances, can determine the course of medical treatment for their children, they are also generally charged with the decision to withdraw or withhold lifesaving or life-prolonging measures on their children's behalf.[23] Because of the dominant role of parents in these circumstances, numerous Courts have grappled with the proper role of the judiciary in making these decisions, and have generally held that judicial approval is not required as a matter of course.[24]

Notwithstanding a preference for the decision to be a personal one by family members, parents, or those who have a legal responsibility for the patient, the Courts have also recognized that they must "always be open to hear these matters on request of the family, guardian, affected medical personnel, or the state."[25] In cases where there is a lack of concurrence among family, physicians, or the hospital, the Courts must be available to decide or oversee the decision-making process.

---

17. *Newmark,* 588 A.2d at 1110.

18. *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).

19. *Matter of Burns,* Del.Supr., 519 A.2d 638, 645 (1986).

20. *Newmark* 588 A.2d at 1116.

21. *Id.*

22. *Parham,* 442 U.S. at 602, 99 S.Ct. 2493.

23. *In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633, 636 (1992).

24. *In re K.I., B.I., D.M.,* 735 A.2d 448, 460; *but see, In re Infant C.,* Va. Cir. Ct., 1995 WL 1058596 (1995) (Circuit Court of the City of Richmond held that it lacked authority to consent to life-saving medical treatment being withheld from a neglected infant: "For an issue as important and irreversible as this one, the Court believes that clear legislative authority in this state is required.") *Matter of Dinnerstein,* 6 Mass.App.Ct. 466, 380 N.E.2d 134 (1978); *Care and Protection of Beth,* 412 Mass. 188, 587 N.E.2d 1377 (1992) ("Generally, 'No Code' orders do not require judicial oversight."); *In re Barry,* Fla.App.Ct., 445 So.2d 365 (1984) ("A decision by parents supported by competent medical advice that their young child suffers from a permanent, incurable, and irreversible physical or mental defect likely to soon result in the child's death should ordinarily be sufficient without Court approval. Of course, diagnosis should always be confirmed by at least two physicians. We must remember that the conscience of society in these matters is not something relegated to the exclusive jurisdiction of the Court."); *In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633 (1992); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983); *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984).

25. *In re Guardianship of Barry,* 445 So.2d at 372; *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984); *In re Joelle Rosebush,* 491 N.W.2d at 638.

Moreover, the parental right to make medical decisions on behalf of a child is not absolute, nor is this Court powerless to review it.[26] The State can intervene in the parent/child relationship where the health and safety of the child is in jeopardy.[27] And, once a child has been adjudicated dependent or neglected, the Family Court, in its role as *parens patriae*, is charged with ensuring the safety and well-being of that child,[28] including reviewing decisions involving medical treatment. Courts have generally held that if a child is already within the jurisdiction of the Court, or where the parents have failed to exercise their parental responsibilities toward the child, or in cases of suspected abuse or neglect, the parents' right to speak for a child may be diminished, or even lost entirely.[29]

In deciding whether a judicial determination is appropriate, the Massachusetts Supreme Court, in *In the Matter of Spring*,[30] set forth the following factors for consideration by the Court:

> [T]he extent of impairment of the patient's mental faculties, whether the patient is in the custody of a State institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the

good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved."

The ultimate issue then, is "who is in the best position to decide (and who gets to decide who will decide)."[31] As the Illinois Appellate Court so aptly stated, where the patient's wishes are not available and the Court is involved, "someone has to decide."[32] Moreover, the fact that the parties have come to an agreement, "while it is to be given great deference, neither defeats the jurisdiction of the Court in a case such as this nor binds it to accept their position."[33]

In the case at bar, there is agreement among family, physicians, the hospital, the Attorney Guardian Ad Litem, and the State, as to what course of action should be taken, which would ordinarily eliminate the need for judicial intervention. Generally, in such cases, the Court need not delve into the propriety of decisions made jointly by the family, physicians, and the guardian. In this instance, however, because the child is in State custody, in the absence of a Court Order, the hospital staff is unwilling to effectuate or implement the consensus of all involved. This case, therefore, presents precisely the type of circumstance where the Court must be available to protect the rights of the child, the parents, and the guardian. Indeed, in

26. *Newmark*, 588 A.2d at 1116; *Parham*, 442 U.S. at 603, 99 S.Ct. 2493.

27. *Id.*

28. 10 *Del.C.* § 1009(a).

29. *In re L.H.R.*, 321 S.E.2d at 722; *Custody of a Minor*, 434 N.E.2d at 607; *Care and Protection of Beth*, 587 N.E.2d at 1380.

30. *In the Matter of Spring*, 380 Mass. 629, 405 N.E.2d 115 (1980); *Custody of a Minor*, 385 Mass. 697, 434 N.E.2d 601, 608.

31. *In re C.A.*, 177 Ill.Dec. 797, 603 N.E.2d at 1177.

32. *Custody of a Minor*, 434 N.E.2d at 608.

33. *Id.*

light of the hospital's unyielding, yet understandable stance, it would be an abdication of judicial responsibility to decline to act.

Having reached this conclusion does not mean that Court intervention is required in every instance, or that the Courts should be involved in medical treatment decisions—even withdrawal of life-sustaining treatment—as a matter of course. This is an unprecedented, and hopefully rare instance where an act of judicial restraint is as much a decision, by default, as any other.

 Nicholas is a dependent child. The parties have so stipulated. Mother has been faithfully visiting her son since he was hospitalized. There is no evidence to suggest that her decision (or that of either parent) would be contrary to the child's best interests. Indeed, both parents have agreed with the treating physicians and the Attorney Guardian Ad Litem that Nicholas' ventilator should be removed and that he should not be resuscitated should he go into cardiac or respiratory arrest. While the Court's decision weighs less heavily under these circumstances, the fact remains that Nicholas is under the jurisdiction of the Family Court, and as such, this Court, in its role as *parens patriae*, has a duty to ensure that medical treatment decisions serve his best interests. Other courts charged with this responsibility have maintained the authority to issue a DNR directive despite parental objection when it was determined, by clear and convincing evidence, to be in the child's best interest.[34] Given the precarious nature of this child's condition, and the agony that the parents will endure in awaiting the result of this decision, it is the Court's

duty to act, and to act promptly. As the New Jersey Supreme Court concluded in the seminal case of *In re Karen Quinlan:*[35]

> Such notions as to the distribution of responsibility ... should however neither impede this Court in deciding matters clearly justiciable nor preclude a re-examination by the Court as to underlying human values and rights. Determinations as to these must, in the ultimate, be responsive not only to the concepts of medicine but also to the common moral judgment of the community at large. In the latter respect, the Court has a nondelegable judicial responsibility.

### C. Standard to be Applied for Judicial Determination on Propriety of DNR Order

 Having determined that the Family Court has jurisdiction over health care decisions for minors in State care, as well as the authority to decide whether life support measures can be ceased and a "Do Not Resuscitate" Order placed on a child's medical chart, the Court must now decide, in the context of this case, the objective standard to be applied in reaching its conclusion. For the reasons discussed hereafter, I conclude that the "best interests" standard, rather than the "substituted judgment" standard, should be applied to the determination of whether to cease life support measures, since Nicholas lacks, and will forever lack, the ability to express a preference regarding his course of medical treatment.

The Delaware Supreme Court has held that, while "all children indisputably have the right to enjoy a full and healthy life

---

34. *In re K.I., B.I., D.M.,* 735 A.2d at 460; *In re Tabatha R.,* 252 Neb. 687, 564 N.W.2d 598 (1997).

35. *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, 665 (1976) (*emphasis added* ).

... a three-year-old boy unfortunately lacks the ability to reach a detached, informed decision regarding his own medical care. This Court must therefore *substitute* its own *objective judgment* to determine what is in [the child's] best interests." [36]

In cases in which this same decision regarding incompetent adults was presented to the Delaware Chancery Court, it has applied a "substituted judgment" test, which has now been included in Delaware's revised guardianship statute, and articulated in case law that examines Delaware's Death With Dignity Act.[37] The test has also been applied in matters surrounding involuntary sterilization.[38]

■ The substituted judgment standard arose in cases involving incompetent adults, who at one time were competent, but subsequently became incompetent. Its purpose is to ensure that the surrogate decision-maker determines, as best it can, what choice the individual, if competent, would have made with respect to medical procedures.[39] Where the patient's wishes are not clearly expressed, the surrogate should:

> consider the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to

medical issues, and all the facts of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose.[40]

The Courts have concluded that, where the incompetent's intentions were previously clearly expressed, they should be respected.[41] The doctrine insures that incompetent persons are entitled to the same respect, dignity, and freedom of choice as competent people.[42]

■ The substituted judgment test, however, is of limited relevance in the case of infants or immature minors, where "almost by definition an infant has no articulable judgment to be substituted." [43] Where the patient has never been competent, the decision-making standard that provides the best guidance is the "best interests" standard.[44] The Court in the District of Columbia even suggested that it would "violate the spirit" of the substituted judgment standard to apply it in the case of an infant:

> [I]n cases involving minor respondents who have lacked, and will forever lack, the ability to express a prefer-

36. *Newmark*, 588 A.2d at 1117 (*emphasis added) citing In re Eric B.*, 189 Cal.App.3d 996, 235 Cal.Rptr. 22, 27 (1987), and *Custody of a Minor*, 379 N.E.2d at 1065.

37. *In the Matter of Tavel*, Del.Supr., 661 A.2d 1061, 1068 (1995); 16 *Del. C.* § 2501 *et seq.*, 12 *Del. C.* § 3901 *et seq.*

38. *In the Matter of Susan S.*, Del.Ch., 1996 WL 75343, Allen, C. (February 8, 1996).

39. *Tavel*, 661 A.2d at 1068.

40. *Id.* at 1069 citing *In re Jobes*, 108 N.J. 394, 529 A.2d 434 (1987).

41. *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (O'Connor, J., concurring opinion); *In re Care and Protection of Beth*, 412 Mass. 188, 587 N.E.2d 1377, 1381.

42. *In re Care and Protection of Beth*, 587 N.E.2d at 1381.

43. *In re C.A.*, 177 Ill.Dec. 797, 603 N.E.2d at 1180; *In re Barry*, 445 So.2d 365, 371–72 (when dealing with the removal of a infant from life support, the doctrine "is difficult to apply to children.").

44. *Rosebush*, 491 N.W.2d at 640.

ence regarding their course of medical treatment, and where the parents do not speak with the same voice but disagree as to the paper course of action, the best interests of the child standard shall be applied to determine whether to issue a DNR.[45]

Since the Delaware Supreme Court referred to the child's "best interests" in the *Newmark* case, and since it is not logical or possible to ascertain this child's desires, the "best interests" standard is the only reasonable standard for the determination of Nicholas' future course of treatment. This does not end the matter, though, because the statutory definition of "best interests" in the Delaware statute[46] relates primarily to the factors to be considered in reaching custody decisions. There are no specific Delaware statutes or controlling judicial precedents that address those interests as they apply to the removal of life support systems from a minor.

While the factors set forth in Section 722 provide only limited guidance to this Court, several courts in other jurisdictions have relied on the definition of "best interests" that is more precisely geared to this type of medical decision.[47] The Court in the *In re Guardianship* case provided a non-exclusive list of factors that should be considered in making this determination:

> [E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably

resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options.

In my judgment, the foregoing list of factors provides a workable standard for determining whether it is in Nicholas' best interests to discontinue life support measures as these factors require the Court to address the very issues that are most relevant and compelling in this difficult situation. They also provide a framework for balancing the burdens of continued life against the benefits and rewards of furthering life. I conclude therefore that the Family Court should consider the foregoing factors in reaching its "best interests" decision.

### D. Evidentiary Standard Utilized for Determination of Whether DNR is in the Best Interests of Child

As a final decision to be reached before applying the law to the facts in the case at bar, the Court must also determine the evidentiary standard to be applied in determining whether it is in this child's best interests to cease life support systems.

Although the evidentiary standard generally applied in dependency proceedings is the "preponderance of the evidence", which requires a Court to determine who has the most competent evidence, the heightened test of "clear and convincing evidence" is more appropriate here because a DNR directive may have a more far-reaching impact.

**45.** *In re K.I., B.I., D.M.,* 735 A.2d at 456.

**46.** 13 *Del.C.* § 722.

**47.** *In re Guardianship of Grant,* 109 Wash.2d 545, 568, 747 P.2d 445, 457 (1987), *modified*

at 757 P.2d 534 (1988); *In the Matter of the Welfare of Colyer,* 99 Wash.2d 114, 660 P.2d 738, 747 (1983); *Conroy,* 98 N.J. 321, 486 A.2d 1209, 1231.

In Delaware, the Courts have held that the clear and convincing standard of evidentiary proof is applicable in judicial proceedings involving the termination of parental rights.[48] The standard has also been held to apply where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state.[49] This heightened evidentiary proof has similarly been required in other civil proceedings involving the termination of important rights.[50]

Clear and convincing evidence is "the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to allegations sought to be established; it is intermediate, being more than mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases."[51]

Based upon the foregoing, I conclude that nothing less than the clear and convincing evidence standard should be applied by this Court in determining whether it is in the child's best interest to approve the Guardian and parents' request to forego life sustaining medical treatment for this child.

## V. CONCLUSIONS

Having determined that the Family Court of the State of Delaware has the power, and indeed, the duty, to grant appropriate relief in this heartbreaking situation, I now turn to the most difficult aspect of this litigation—the ultimate determination of whether it is in Nicholas' best interests to direct the hospital to cease life-sustaining medical measures and allow nature to take its course. While the Court is asked to make this determination in the absence of controversy, and with the concurrence of the parents, the physicians, the Guardian, and the Division, the decision is no less tortuous or agonizing. Even with high regard for the parents' and guardian's courage and anguish, in the final analysis, it is the Court's responsibility to make the right decision for this innocent child based upon all of the evidence presented.

In so doing, the Court is comforted by the fact that competent, learned, compassionate physicians—those treating the child, as well as an independent expert in this area—all reached the same conclusion with respect to this child's quality of life. All three doctors recommended that the relief requested by the Guardian be granted. In fact, the three medical opinions on the diagnosis and prognosis were clear and unanimous as to the child's condition and future.

Nicholas will never stand, sit, eat, walk, speak, read, write, think, or exist without constant care for even the most basic of life's functions. He will be confined to his bed and will suffer constant lung infections because of his virtually non-existent gag reflex. He will never be able to communicate joy, fear, happiness, or sadness, will never be able to form relationships with others, and will live with tubes, machines, and other specialized medical care. He will never react to his surrounding environment, will never give or receive love, and may be subjected to substantial pain and discomfort. The physicians have eval-

---

**48.** *In re Stevens*, Del.Supr., 652 A.2d 18 (1995).

**49.** *Tavel*, 661 A.2d at 1070.

**50.** *Newmark*, 588 A.2d 1108; *William H.Y. v. Myrna L.Y.*, Del.Supr., 450 A.2d 406 (1982).

**51.** *Shipman v. Division of Social Services*, Del. Fam., 454 A.2d 767, 769 (1982), *affirmed*, Del.Supr., 460 A.2d 528 (1983).

uated the child's condition and have concluded that a future sustained by radical medical treatment, and entailing virtually no quality of life, is not a valued alternative, despite its effectiveness in extending life or delaying death.

It is also important to note that there was no evidence presented in this case regarding any treatment for the child's underlying brain injury. Indeed, there is no known treatment that will reverse the severe damage that he has sustained. Nor was there any question raised as to any appropriate medical treatment for effectuating even a temporary cure for the child's condition. The entry of a DNR Order on Nicholas' medical chart is *not* a request for the provision of essential medical treatment in the hopes of prolonging life, but a prohibition against heroic and extraordinary efforts at resuscitation in order to avoid a pointless—even cruel—extension of the act of dying.

Moreover, the physicians made it clear that cardiac distress or arrest would involve a substantial degree of bodily invasion accompanied by discomfort and pain if they were required to resuscitate. Indeed, the descriptions in the case law of such extraordinary medical measures are bitter and excruciating.[52] Resuscitation techniques are specifically described *In the Matter of Dinnerstein* as follows:

> Such efforts typically involve the use of cardiac massage or chest compression and delivery of oxygen under compression through an endotrachial tube into the lungs. An electrocardiogram is connected to guide the efforts of the resuscitation team and to monitor the patient's progress. Various plastic tubes are usually inserted intravenously to supply medications or

stimulants directly to the heart. Such medications may also be supplied by direct injection into the heart by means of a long needle. A defibrillator may be used, applying electric shock to the heart to induce contractions. A pacemaker, in the form of an electrical conducting wire, may be fed through a large blood vessel directly to the heart's surface to stimulate contractions and to regulate beat.

In *Custody of a Minor*, the Massachusetts Court further emphasized that such heroic efforts are also not without their own risks:

> If heroic medical efforts were to be used to resuscitate the child, such efforts would be invasive and traumatic and would cause the child to suffer substantial pain and possible brain damage. The side effects of heroic medical efforts to resuscitate would result in a further weakened condition, substantial pain, and possible neurological and liver damage. The medical testimony was that a heroic effort to resuscitate the child would not be in the child's best interests and would offend medical ethics.[53]

I conclude therefore that the expert medical testimony was clear and convincing that it is in Nicholas' best interests to forego the use of heroic medical efforts to resuscitate him, that the ventilator should be removed, that he should be administered medication for pain but not infection, and that he is so irreparably devastated by his injury that the natural processes of life and death should not be interrupted by radical intervention. This decision is based upon factors such as the child's substantial mental and physical retardation,

---

**52.** *In the Matter of Dinnerstein*, 6 Mass.App. Ct. 466, 380 N.E.2d 134; *Care and Protection of Beth*, 587 N.E.2d at 1382.

**53.** *Custody of a Minor*, 434 N.E.2d at 604.

the pitiful quality of his life and future, the futility, pain, and intrusiveness of heroic efforts, and sound medical and ethical judgment. There was no medical evidence to the contrary.

The Court is further guided in this decision by the wishes of Nicholas' parents whose judgment is to be given great deference, notwithstanding the fact that he has been determined to be "dependent." [54]

Both the child's mother and father, after consultation with the treating physicians and the Guardian, and after much soul-searching and anguish, have expressed their desire that extraordinary measures not be used to prolong their son's life. The fact that the parents are of the same heart and mind, and that both agree with the physicians and the Guardian, is no doubt indicative of the devastating nature of Nicholas' injuries and the hopelessness of his condition.

I am satisfied that the parents have made this decision with the best interests of Nicholas as their guidepost. Mother has been visiting the child daily and has had numerous opportunities to discuss his condition with the doctors and nurses who have been caring for him. She knows of the child's prospects for his future and the fact that he will be confined to a life of hopelessness and total dependence. The father is also fully aware of the kind of life that the artificial medical devices serve to prolong and preserve. It is one that the parents do not wish their son to live, especially at the expense of his dignity. It is with great courage that the parents have made this decision in their son's best interests, and this Court should honor it.

The Attorney Guardian Ad Litem for Nicholas has also concluded that it is in the child's best interests to withhold heroic measures and allow the child to live or die, unimpeded by medical contrivances. Although it is obvious that the Guardian has come to love and cherish this baby, he has also exercised an informed and rational judgment, free of bias or motive, as to the least detrimental alternative. The Guardian was also instrumental in securing the parents' release from prison to be at the baby's bedside, in having Nicholas baptized, and in offering guidance to the parents in reaching this difficult decision.

The Guardian testified at trial that "I knew I had to get the issue before the Court." He described the child as "trapped" and in obvious distress as he has seen the child's tears whenever the hospital staff has tried to do anything to or for him. He emphasized that, while the child may be cute now, when he is a six-year-old in a crib, with no capacity to do anything for himself, it will be pathetic. The Guardian strongly urges this Court to let the natural processes of life and death play out for this child, by removing the ventilator and avoiding heroic measures in the event of cardiac arrest.

In the case at bar, the State Division of Family Services did not assert the State's interest in the preservation of life, which is generally the State's position as decisions in other jurisdictions in cases of this nature reveal. Nor did the State express any intent to make a decision, or to oversee the parents' decision, despite the fact that it stipulated that the child is dependent and will remain in State custody. The State has apparently determined, consistent with the opinions of the doctors and

---

**54.** *In re K.I.,* 735 A.2d at 461 As noted by the District of Columbia Court of Appeals, "the Court recognizes that the parents of a neglected child retain various residual rights over the respondent D.C.Code § 16–2301(22), and that even in the context of neglect proceedings, parental opposition to the issuance of a DNR Order must be paid tremendous heed."

the recommendation of the Guardian, that the child's condition is so incurable and irreversible that the State's interest in prolonging the child's life through extraordinary measures is not sufficient to override the parents' informed decision. The State has thus recognized that its interest in the preservation of life is not absolute, and that there is a significant distinction between prolonging life where the injury may or will improve, as opposed to the State's interest in extending life, when it is simply not humane to do so.

Finally, I should note that I do not consider the issue presented in this case to be one of "right to life." In a case involving the entry of a DNR Order, the question is not one of life or death, but the manner in which that life should be artificially extended—or death delayed—in a bodily environment essentially bereft of quality. Neither the Guardian, nor the parents, nor the physicians, have sought any affirmative measures to terminate this child's life. They only desire to eliminate the artificial barriers standing between Nicholas and the natural processes of life and death that would otherwise ensue.

As medical science continues to advance its life-saving and life-extending technology, these distinctions may become increasingly blurred, and physicians may more frequently invoke the aid of the Courts. At least insofar as this case is concerned, however, it is quite clear that the decision against resuscitative therapy is a humane response by the medical profession to an incurable and desperate situation. Indeed, in the landmark *Quinlan* case, the medical profession was generally credited with having the wisdom and compassion to differentiate, both professionally and ethically:

We glean from the record here that physicians distinguish between curing the ill and comforting and easing the dying; that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refuse to treat the hopeless and dying as if they were curable. In this sense, ... many of them have refused to inflict an undesired prolongation of the process of dying on a patient in irreversible condition when it is clear that such "therapy" offers neither human nor humane benefit. We think these attitudes represent a balanced implementation of a profoundly realistic perspective on the meaning of life and death and that they respect the whole Judeo–Christian tradition of regard for human life. No less would they seem consistent with the moral matrix of medicine, "to heal", very much in the sense of the endless mission of the law, "to do justice." [55]

\* \* \*

The type of conclusion I have had to make in this case would be difficult in the case of an adult suffering from a terminal illness. It is even more agonizing when the subject of the Court's decision is a young infant, whose life has barely begun. Yet, in my judgment, the evidence is clear and convincing that it is in this small child's best interests to grant the relief requested by the Attorney Guardian Ad Litem, and to enter an Order, in the form attached hereto, directing that Nicholas Truselo be removed from the ventilator and a "Do Not Re–Intubate" and "Do Not Resuscitate" Order be placed on his medical chart.

It is further Ordered that if the medical condition of Nicholas Truselo and/or the

---

**55.** *In re Quinlan,* 355 A.2d at 667.

circumstances surrounding this case change, such that the physicians, the Guardian, or the parties believe this Order or the separate Order Regarding Resuscitation, dated September 11, 2000, need be modified, the Court will be available for hearing upon request.

**IT IS SO ORDERED.**