IN THE SUPREME COURT OF THE STATE OF DELAWARE

DAVID HUNT and CAREY LAND,[1] §
§ No. 439/449, 2015
Respondents Below, §
Appellants, §
§ Court Below–Family Court
§ of the State of Delaware,
v. §
§ in and for Sussex County
§
DIVISION OF FAMILY SERVICES §  File No.: CS15-01879
and OFFICE OF THE CHILD §  Pet. No.: 15-04833
ADVOCATE, §
§
Petitioners Below, §
Appellees. §

Submitted: September 15, 2015
Decided: September 16, 2015

Before **STRINE**, Chief Justice; **HOLLAND, VALIHURA, VAUGHN** and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Family Court. **AFFIRMED**.

Alaina M. Chamberlain, Esquire, Law Office of Edward C. Gill, P.A., Georgetown, Delaware, Attorneys for Appellant, David Hunt.

Mark H. Hudson, Esquire, Haller & Hudson, Georgetown, Delaware, Attorneys for Appellant, Carey Land.

Janice R. Tigani, Esquire (*argued*), Patricia Dailey Lewis, Esquire and Carole E. L. Davis, Esquire, Department of Justice, Georgetown, Delaware, Attorneys for Appellee, Division of Family Services.

---

[1] The Court assigned pseudonyms to the parties and the children pursuant to Supreme Court Rule 7(d).

Kim DeBonte, Esquire, Office of the Child Advocate, Georgetown, Delaware, Attorney Guardian *ad Litem* for Adam Hunt.

**HOLLAND**, Justice:

This expedited proceeding is the biological Mother's and Father's interlocutory appeal from the August 13, 2015 Family Court decision granting the attorney guardian *ad litem's* Motion Instructing Medical Providers of Adam Hunt to De-Escalate Medical Intervention and Place a Do Not Re-Intubate Order and a Do Not Resuscitate Order, Along with an Order for Comfort Measures on Adam's Medical Chart ("Motion to De-Escalate Medical Treatment").

Four issues are presented in this appeal. First, does the Delaware Family Court have jurisdiction to de-escalate medical care, decide whether or not life support measures can be ceased, and place a "Do Not Resuscitate" ("DNR") and "Do Not Re-Intubate" order on a minor child's chart? Second, does the Family Court have authority to de-escalate medical care, decide whether or not life support measures can be ceased, and place a DNR order and "Do Not Re-Intubate" order on a minor child's chart, where that minor child's parents' rights have not been terminated, and where the parents have objected to such an order? Third, did the Family Court violate the parents' procedural due process rights by not providing the parents with adequate notice and process prior to entering its order? Fourth, did the Family Court violate the parents' due process rights, or otherwise err, in rendering its decision without receiving evidence from an independent expert in the medical field?

We have determined that the Family Court properly exercised its jurisdiction and afforded the parents due process. Therefore, the judgment of the Family Court is affirmed.

## Facts[2] and Procedural History

Adam was born on February 19, 2015 addicted to narcotics. After a four week stay in the hospital to be weaned from drugs, Adam was released to his parents, David Hunt ("Father") and Carey Land ("Mother"). The Division of Family Services ("DFS") became involved with this family after Adam's birth.

When Adam was barely three months old, emergency personnel were called to the home of Mother and Father in Harbeson, Delaware. On May 23, 2015, Adam was found to be unconscious, unresponsive, and his face and lips were blue. He was ventilated with a mask and bag, and an IV was begun through a hole drilled in his leg. He was transported to Beebe Hospital in Lewes.

Neither Mother nor Father offered an explanation as to why Adam was unresponsive and unconscious. Although they were home at the time the emergency personnel arrived, neither Mother nor Father accompanied Adam to the hospital. Mother eventually went to the hospital with a police officer; Father never went to the hospital.

---

[2] The facts and procedural history are taken from the August 13, 2015 opinion of the Family Court.

Due to his serious condition, Adam was immediately transferred to Nemours/Alfred I. duPont Hospital for Children ("A.I. duPont") in Wilmington, Delaware. On May 26, 2015, Dr. Allan DeJong, the medical director of A.I. duPont's child abuse program, and an expert in child abuse pediatrics and medical evaluation of children for abuse and neglect examined Adam. Dr. DeJong opined that Adam sustained multiple fractures caused by unexplained abusive trauma. In addition to multiple fractures, Adam's other diagnoses included chronic bilateral subdural hematomas, destruction of brain tissue, seizures, respiratory failure, malnourishment, and splitting of the layers of the retina in his left eye.

On May 28, 2015, DFS filed a Dependency/Neglect Petition for Custody, requesting emergency ex parte custody of Adam Hunt (DOB: 02/19/15). The petition alleged that Adam was neglected and abused in the care of his parents. DFS asserted that Adam had been hospitalized for serious physical injuries. Because Mother and Father were suspects in his abuse, the Family Court awarded emergency custody of Adam to DFS.

On May 28, 2015, the Family Court appointed Kim DeBonte, Esquire, of the Office of the Child Advocate, as Adam's attorney guardian *ad litem* ("AGAL")[3].

---

[3] Delaware's General Assembly has recognized the need to safeguard the welfare of abused, neglected and dependent children in this State, and has charged the Office of the Child Advocate with ensuring the representation of children's best interests in child welfare proceedings through appointments of guardians *ad litem*. 29 *Del. C.* § 9007A(a). Once appointed to represent a child's best interests, "the attorney guardian *ad litem's* duty is to the child." 29 *Del. C.* §

On June 4, 2015, the Family Court held a Preliminary Protective Hearing. Mother appeared, but Father did not. Service of process had not yet occurred on Father. The Family Court found Mother to be indigent and appointed counsel on her behalf. Mother consented to a finding of probable cause that Adam, as well as his older brother, James (DOB 5/21/13), continued to be in actual physical, mental, or emotional harm, or there was a substantial imminent risk thereof.

The Family Court received testimony that Adam had suffered extensive injuries and would likely require institutional care and/or life support for the remainder of his life. Due to Adam's injuries, as well as concerns as to the nature of the care being provided by Mother and Father, the Family Court found that probable cause existed to believe that both children continued to be in actual physical, mental, or emotional danger with regard to Father. The Family Court also found that DFS had made reasonable efforts to prevent the unnecessary removal of the children from their home. Accordingly, the Family Court continued temporary custody of both children with DFS. The Family Court ordered genetic testing of both children.[4] The Family Court also scheduled an Adjudicatory Hearing.

---

9007A(c). Though the Office of the Child Advocate is a State agency, the mandates set forth in 29 *Del. C.* § 9005A and 29 *Del. C.* § 9007A require this agency to independently protect the "welfare of abused, neglected and independent children" in Delaware, by "[t]ak[ing] all possible actions . . . to secure and ensure the legal, civil and special rights of the children."

[4] The results of the genetic testing show that Hunt is the biological father of both Adam and James.

On June 26, 2015, the AGAL filed the Motion to De-Escalate Medical Treatment, in which she requested a hearing to determine whether it is in Adam's best interests to de-escalate his medical intervention. The Motion to De-Escalate Medical Treatment stated that Adam had been diagnosed with numerous medical conditions which are highly characteristic of non-accidental trauma. As a result of his injuries, Adam was placed on life support. Mother visited Adam twice in June after his admission to A.I. duPont and cancelled other scheduled visits without providing any explanation. Father did not visit Adam once in June or contact DFS to schedule a visit.

Attached to the Motion to De-Escalate Medical Treatment were several affidavits from Adam's physicians at A.I. duPont, all of which concluded that it is in Adam's best interests to de-escalate medical intervention and provide "comfort care" instead. Mother had been informed of Adam's prognosis, but indicated that she does not wish to withdraw care.

On June 30, 2015, the Family Court held an emergency hearing to receive evidence concerning the Motion to De-Escalate Medical Treatment. Mother had been personally served with notice of the hearing on June 27, 2015, and she was present with counsel. Father had not been personally served, but appeared

7

anyway.[5] The Family Court found Father to be indigent and appointed counsel on his behalf. Father's attorney requested a continuance, arguing that she had just met Father, only learned of the hearing the previous day, and did not have time to prepare for a hearing with such significant consequences. The Family Court denied the request.

On July 6, 2015, the Family Court issued its Order from the June 30 hearing, denying the Motion to De-Escalate Medical Treatment due to a lack of evidence indicating that Adam was at risk of immediate and irreparable harm as well as the absence of a finding of dependency, neglect, or abuse. The Adjudicatory Hearing had not yet been held, and therefore a finding of dependency, neglect, or abuse had not yet been made. The Family Court's Order stated that Mother and Father would be permitted to seek an independent medical expert's opinion of Adam's condition, and that the Motion to De-Escalate Medical Treatment would be re-addressed at an appropriate time.

On July 23 and 28, 2015, the Family Court held an Adjudicatory Hearing with regard to Adam and James. Both parents were represented by counsel. During the hearing, evidence was presented that Adam was born addicted to narcotics and spent four weeks in the hospital. The evidence also revealed that Adam was in the exclusive control of Mother and/or Father at the time he sustained

---

[5] Service of DFS's Dependency/Neglect Petition for Custody had been accomplished as to Father by publication on June 18, 2015 and by personal service on June 30, 2015.

8

his injuries, and that it was not possible for Adam to cause the harm to himself. Lastly, the evidence showed that Mother and Father failed to seek medical attention for Adam despite obvious signs that he was severely injured.

On August 10, 2015, the Family Court held a teleconference with counsel for Mother and Father, DFS, and Adam's AGAL. The primary purpose of the teleconference was to determine the status of an independent medical examination requested by Mother and Father at the conclusion of the June 30, 2015 hearing. The Family Court was informed that an independent examination of Adam had not been performed.

Counsel for Mother and Father stated that The Children's Hospital of Philadelphia, Johns Hopkins Hospital of Baltimore, St. Christopher's Hospital for Children ("St. Christopher's") in Philadelphia, and the Children's National Medical Center ("CNMC") in Washington, D.C. all declined to perform the evaluation. The Family Court and counsel engaged in a discussion as to the purpose of an independent medical examination. Counsel for Mother responded that such an examination is required due to the finality of the Family Court's decision. The AGAL asserted that it is simply good practice. The AGAL also asserted, however, that it is her position that an independent assessment of Adam's condition was performed by Dr. Stephen Falchek. Dr. Falchek is the Chief of Pediatric Neurology at A.I. duPont. The AGAL explained that there are very few

9

pediatric neurologists in the area not associated with A.I. duPont and that Dr. Falchek has never been involved with Adam's treatment.

At the conclusion of the teleconference, the AGAL renewed her Motion to De-Escalate Medical Treatment. Additionally, all of the parties agreed that there was no additional evidence or argument to be presented in this matter other than the results of an independent medical examination, if one was performed.

On August 11, 2015, the Family Court issued its Order from the Adjudicatory Hearing, finding that James was neglected in the care of his parents, and that Adam was neglected and abused in the care of his parents. Accordingly, the Family Court awarded custody of both children to DFS.

### Evidence Presented

At the June 30, 2015 hearing on the AGAL's Motion to De-Escalate Medical Treatment, the Family Court received testimony from four expert witnesses concerning Adam's medical condition and prognosis. Dr. Allan R. DeJong is the medical director of the child abuse program at A.I. duPont, and testified as to Adam's medical condition, as well as to an evaluation of child abuse that he performed. Dr. Shirley Viteri is a pediatric critical care physician at A.I duPont, involved in Adam's care. Dr. Joseph Piatt is a pediatric neurosurgeon at A.I. duPont who performed surgery on Adam's skull and otherwise testified as to his

condition. Dr. Stephen Falchek, Chief of Pediatric Neurology at A.I. duPont, conducted an independent assessment of Adam's diagnoses and prognoses.

The testifying doctors all described Adam's condition as very poor. Adam has been diagnosed with the following conditions: a closed fracture of the left parietal bone; bilateral, chronic subdural hematoma; E. Coli infection; spinal meningitis; clavicle fracture; compression fracture of the L4 vertebra; multiple closed fractures of the ribs; seizure disorder; closed subtrochanteric fracture of the left femur; malnutrition; closed fracture of distal end of right radius; closed fracture of distal end of left forearm; posttraumatic respiratory failure; umbilical hernia; retinal hemorrhage; retinoschisis in the left eye; diabetes insipidus; ventilator associated bacterial pneumonia; and bilateral cystic encephalomalacia.

Dr. Viteri testified that Adam's brain is unable to properly regulate his hormone levels. Consequently, Adam is unable to fight infections or control his breathing, blood pressure, sodium levels, or bodily movements. Dr. Viteri explained that Adam will always require mechanical assistance to eat and breathe; never walk or talk; not be able to interact or respond to those around him; require twenty-four-hour care for all of his needs by a trained caretaker; likely be deaf and blind; and need to wear diapers for the rest of his life.

Dr. Viteri stated that Adam is currently attached to a ventilator via an endotracheal tube. This tube runs through Adam's mouth, down his throat,

11

through his vocal chords, and into his lungs. Adam has also been fitted with a nasogastric tube for the purpose of providing nutrition, which runs through his nose, down the back of his throat, down the esophagus, and into the stomach. Dr. Viteri testified that there are risks associated with the continued placement of these life support systems, including infection, pneumonia, damage to the vocal chords, and erosion of any tissue coming into contact with the tubes.

Dr. Viteri stated that she has attempted to wean Adam off of the ventilator but was unsuccessful. In order to provide Adam with long-term care, the endotracheal tube and nasogastric tube must be surgically replaced with other tubes which are inserted directly into Adam's neck and stomach. Due to Adam's inability to regulate his fluids and sodium levels, the need to place him on intravenous fluids prior to the procedures may further disrupt his sodium balance. Additionally, there is a risk of complications associated with the anesthesia. Finally, the procedures themselves carry a risk of bleeding, infection, and disruption to parts of the body surrounding the surgical sites.

Dr. Viteri testified that there is no set time at which the switch to more permanent life support systems should take place, but that Adam's current treatment is nearing the end of its sustainability. The current life support systems may not remain in place indefinitely due to the erosion of tissue surrounding the tubes, as well as the potential for sores, chronic sinusitis, and infection.

Additionally, the continued removal and insertion of the tubes carries a risk of puncturing or perforating the membranes in the nose and throat. In Dr. Viteri's opinion, the erosion process occurs at an "intermediate rate" of weeks to months.

Dr. Viteri stated that she does not believe there is any chance for improvement of Adam's condition. Dr. Viteri testified that although the procedures to replace Adam's breathing and feeding tubes would likely keep him alive, they would also cause him pain. Accordingly, Dr. Viteri asserted that the best course of treatment for Adam is to remove life support and apply "comfort care." Dr. Viteri stated that Adam would likely die within a few days after the removal of life support.

Dr. DeJong testified that he first examined Adam on May 26, 2015, three days after Adam's transfer to A.I. duPont from Beebe Hospital. The purpose of Dr. DeJong's involvement in Adam's case was to assess whether Adam's multiple unexplained injuries were the product of abuse. At the time of the examination, Adam was a patient in the pediatric intensive care unit. He was unconscious during the examination. Dr. DeJong testified that Adam's current treatment, including the use of a ventilator and oral gastric tube, is limited to keeping Adam alive and will not improve his condition. Due to his brain injuries, Adam will never be able to eat or breathe on his own. Nor will Adam ever be able to see, hear, or walk again. For these reasons, Dr. DeJong testified that it is in Adam's

13

best interests to withdraw life support, provide "comfort care," and allow Adam to die peacefully.

Dr. Piatt testified that Adam's cerebrum is nearly totally destroyed and "full of holes." Dr. Piatt stated that there is no neurosurgical treatment available to help Adam's brain condition. Dr. Piatt does not believe Adam will ever develop like other infants or be capable of any "purposeful" activity including walking, talking, communicating, and feeding himself. Dr. Piatt believes that Adam is capable of reacting to pain, but does not experience it in the same manner as someone who is conscious. Dr. Piatt declined to provide his opinion concerning the course of action that is in Adam's best interests on the grounds that it is a philosophical question beyond his realm of expertise.

Lastly, Dr. Falchek testified that he was asked by the AGAL to perform an independent evaluation of Adam. Although Dr. Falchek is the chief of the division providing Adam with care, Dr. Falchek had almost no exposure to Adam's case prior to the request.[6] Accordingly, Dr. Falchek testified that he is capable of providing an independent assessment of Adam. Dr. Falchek's evaluation was based on a bedside examination as well as a review of Adam's medical chart and various test results including an EEG, two MRIs, brain imaging, and a CAT scan.

---

[6] Dr. Falchek testified that his only exposure to Adam's case prior to receiving the request for an independent evaluation was the verification of a report prepared by a nurse practitioner during normal rounds.

14

Based upon his evaluation, Dr. Falchek testified that Adam has sustained "devastating" brain injuries. Specifically, Adam's brain stem has experienced a lack of blood flow, and multiple other parts of Adam's brain, particularly the area responsible for sight, have literally "liquefied." Dr. Falchek testified that Adam had received two MRIs at the time of his assessment, and that the second MRI showed an advancement of damage to Adam's brain stem. Dr. Falchek stated that Adam will not recover from his injuries or function in an age-appropriate manner. Dr. Falchek further stated that Adam will never be able to walk, talk, communicate in a meaningful way, form relationships, or feed himself. Thus, Adam will be dependent on others for care for the rest of his life. Additionally, Adam will continue to experience seizures. Adam may experience pain from seizures if the area of his brain responsible for processing pain, the thalamus, has not been completely destroyed. Dr. Falchek concluded that there is no benefit to continuing Adam's current medical treatment. Dr. Falchek testified that Adam would likely die within a few days after the removal of life support.

On July 6, 2015, the Family Court originally declined to grant the Motion to De-Escalate Medical Treatment for two reasons. First, the Family Court was concerned about the absence of a finding that Adam was dependent, neglected, or abused in the care of his parents. Second, the Family Court determined that a finding of immediate and irreparable harm was also necessary due to the

15

"emergency" nature of the Motion to De-Escalate Medical Treatment, and that the evidence was insufficient to support such a finding. The Family Court stated that the Motion to De-Escalate Medical Treatment would remain pending and addressed at a later date.

After the July 6, 2015 Order was issued, the Family Court made a determination that Adam was abused and neglected in the care of Mother and Father. Consequently, the Family Court decided to address the issue of whether it will intervene in Adam's medical care.[7] Furthermore, since the Motion to De-Escalate Medical Treatment was no longer being considered within the context of an emergency hearing, a finding of immediate and irreparable harm would not be necessary.

### *Independent Medical Examination*

At the conclusion of the June 30, 2015 hearing, counsel for Mother and Father raised the issue of conducting an independent medical examination of Adam. In the July 6, 2015 Order, the Family Court found the request to be in Adam's best interests. More than a month after that decision, however, an independent medical examination had not taken place. Counsel for Mother and

---

[7] *See* 10 *Del. C.* § 1009(b)(11) (2015) (following an adjudication by the Family Court in which it declares a child to be dependent or neglected, the Family Court may order such other treatment, rehabilitation or care as in the opinion of DFS would best serve the needs of the child and society); 10 *Del. C.* § 921(4). *See also In re Truselo*, 846 A.2d 256, 269 (Del. Fam. Ct. 2000); *Newmark v. Williams* 588 A.2d 1108 (Del. 1991).

16

Father, with the assistance of the AGAL, contacted four hospitals and several private physicians in an attempt to obtain an independent assessment, but were unsuccessful.

The parties agreed that an independent examination is appropriate. The AGAL has suggested that it is good practice in a matter such as this one. The AGAL further argues, though, that Dr. Falchek already performed an independent examination on Adam. Mother and Father contend that an independent examination is necessary due to the finality of the Family Court's decision. They assert that Dr. Falchek is not truly independent by virtue of his employment with A.I. duPont.

In its August 13, 2015 decision, the Family Court found that an examination of Adam's condition by a physician completely unaffiliated with A.I. duPont is not required prior to resolving the Motion to De-Escalate Medical Treatment. Although the Family Court initially expressed reservations concerning Dr. Falchek's independence, those reservations no longer existed when the Family Court issued its August 13, 2015 decision. The Family Court found there was no indication that Dr. Falchek's employment with A.I. duPont affected his ability to perform an independent examination of Adam's condition. Dr. Falchek had little knowledge of Adam or his condition prior to his examination. Dr. Falchek swore to his independence under penalty of perjury. There were no allegations or

17

evidence indicating that the testifying physicians have engaged in any sort of collusion or impropriety. All four of the physicians who testified in this case provided an almost identical assessment of Adam's condition and prognosis. The certainty in each of those medical opinions led the Family Court to believe that a fifth examination would not result in a different opinion.

Additionally, the Family Court found there must be some limit on the amount of time for another examination to occur. Five weeks had passed since the Family Court authorized Mother and Father to seek an independent medical expert's opinion. Despite their efforts, one had not been obtained. Nor had there been a suggestion that any party was close to arranging for a different physician to examine Adam. The evidence showed that Adam's condition is degenerative, and that his current life support systems are nearing the end of their sustainability.

There was nothing before the Family Court to indicate that there has been a reversal in Adam's condition. The Family Court decided that it must weigh the harm associated with providing more time, namely the deterioration of Adam's condition and need for surgery to replace his life support systems, against the benefits of obtaining another opinion. The Family Court found that the balance favored moving forward without a fifth evaluation and issued its August 13, 2015 decision.

*Independent Medical Examination Performed*

On September 4, 2015, this Court remanded the case and directed the Family Court to appoint an independent medical expert to examine Adam and provide an opinion concerning Adam's diagnosis, prognosis, and recommended course of treatment. Upon receipt of the independent medical expert's opinion, the Family Court was further directed to issue its own opinion stating what effect, if any, the expert's opinion has on the Family Court's August 13, 2015 decision to de-escalate Adam's medical treatment. The Family Court appointed Dr. Richard Fisher of Christiana Care Health Systems to conduct the independent medical examination of Adam.

On September 9, 2015, Dr. Fisher submitted his opinion to the Family Court. Dr. Fisher concurs with the diagnosis, prognosis, and recommended treatment of Adam made by the four physicians who already testified in this case. Dr. Fisher's independent medical opinion states:

> Adam has sustained profound non-accidental brain trauma complicated by subsequent bacterial meningitis. His testing has shown bilateral cortical, white matter, cerebellar and brainstem damage that is irreversible.
>
> From a clinical standpoint he is now and will be in the future unable to protect his airway from aspiration pneumonia and if medically managed will require tracheostomy and possibly continued artificial ventilation. He is also unable to be fed orally due to neurologic impairment and would require gastrostomy

19

placement. These neurologic deficits are in my opinion permanent.

Overall, there is no chance that he will recover neurologic function that would allow for developmental improvement. He is currently in a "coma vigil" state in which his eyes are open but not indicative of consciousness. He has shown no neurologic improvement in over 2 months of hospitalization at A.I. DuPont. In my opinion continuation of medical support will only prolong his suffering without any prospect of meaningful recovery.

Dr. Fisher concluded that Adam will not recover from his injuries, and that "the continuation of [Adam's] medical support will only prolong his suffering without any prospect of meaningful recovery." Because Dr. Fisher's opinion conforms to the positions of the physicians who have already offered opinions in this matter, the Family Court found that Dr. Fisher's opinion supports the Family Court's August 13, 2015 decision to de-escalate Adam's medical treatment.

During oral argument on September 15, 2015, this Court was advised that Adam's breathing tube had been dislodged the night before and he was breathing on his own for less than 24 hours. We directed the AGAL to provide the Court with expedited updated medical opinions from Dr. Fisher and Adam's physicians at A.I. duPont. It was the unanimous opinion of Adam's treating physicians at A.I duPont and Dr. Fisher that the overnight change in Adam's condition did not change the prior medical opinions.

20

### *Family Court's Jurisdiction*

The Family Court only has jurisdiction that is specifically vested in it by statute.[8] The first issue on appeal is whether the Family Court has jurisdiction to order the de-escalation of medical treatment and the removal of life support for Adam. 10 *Del. C.* § 921(4) states that the Family Court will have exclusive civil jurisdiction concerning "[j]udicial consent to employment, medical care, or enlistment in the armed services of a child when such consent is required by law."

Although the definition of "medical care," when dealing with the authority to consent on behalf of a minor does not expressly include refusal of care, in other sections of the Delaware Code the General Assembly has included refusal of treatment and entry of DNR orders when defining health care decisions for adults. For example, 16 *Del. C.* § 2501(g) defines "health care" as "any care, treatment, service or procedure to maintain, diagnose or otherwise affect an individual's physical or mental condition." The General Assembly defined "health-care decision" as a decision made by an individual, agent, surrogate or guardian that includes "[a]cceptance *or refusal* of diagnostic tests, surgical procedures, programs of medication and orders not to resuscitate; [and] [d]irections to provide, *withhold or withdraw* artificial nutrition and hydration and all other forms of healthcare."[9]

---

[8] Del. Const. art. IV, § 7A.
[9] 16 *Del. C.* § 2501(h)(2)–(3) (emphasis added).

Because the General Assembly crafted Chapter 25 of Title 16 to deal exclusively with adults,[10] its utility in this case is limited. Nevertheless, Mother argues that because 16 *Del. C.* § 2501 specifically addresses a method by which the health care decision of now infirm adults can assure their end of life wishes are honored, and because the General Assembly did not specifically address the question of such orders for dependent children, then the Family Court lacks the jurisdiction to make this decision for Adam.

The issue presented in this proceeding is whether the Family Court's undefined statutory authorization to consent to medical care includes the authority to withhold medical care. The Family Court answered that question affirmatively in a very similar case.[11] In *In re Truselo*, an attorney guardian *ad litem* filed a motion on behalf of a child who was in the custody of DFS, seeking an order directing medical providers to de-escalate medical intervention and place a DNR order, with comfort measures, on the child's medical chart.[12] In that matter of first impression, the Family Court analyzed its jurisdiction over cases involving the removal of a child's life support, the Family Court's authority to terminate life support, and the standards to be applied in such cases.[13]

---

[10] *See, e.g.*, 16 *Del. C.* § 2502.
[11] *In re Truselo*, 846 A.2d at 272.
[12] *Id.* at 259.
[13] *Id.* at 264.

In its analysis, the *Truselo* Court relied upon several different sources of legal authority in concluding that the Family Court has jurisdiction over cases involving the decision to remove a child's life support and de-escalate medical treatment. That is, the Family Court gave several reasons why it believed the statutory reference to consent to medical care included consent of all medical procedures, including those that involved de-escalation of care, if that was in the best interests of the child. First, the *Truselo* Court cited to the Delaware statute which permits the Family Court to commit a child to the custody of DFS upon a finding of abuse or neglect.[14] The *Truselo* Court noted that such authority includes judicial consent to medical care and treatment of a child.[15] The *Truselo* Court then discussed this Court's opinion in the case of *Newmark v. Williams*. Although *Newmark* did not directly address the issue of the Family Court's jurisdiction over the removal of life support, the *Truselo* Court reasoned that this Court implicitly acknowledged such jurisdiction.[16] Finally, the *Truselo* Court reviewed case law from other jurisdictions and concluded that "the empowerment to determine medical care of a child includes the [Family] Court's power to enter [o]rders terminating those procedures."[17] "To the extent that Delaware authority is not directly on point, [the *Truselo* Court noted that] Juvenile, Probate, and Family

---

[14] *Id.* at 265 (citing 10 *Del. C.* §§ 921(1), 902).
[15] *Id.* (citing 10 *Del. C.* § 921(4), 13 *Del. C.* § 707(b) and *Newmark*, 588 A.2d 1108 (Del. 1991)).
[16] *Id.* at 266 n.10.
[17] *Id.* at 266.

23

Courts in other jurisdictions have considered these questions and have held that the empowerment to determine medical care of a child includes the [c]ourt's power to enter [o]rders terminating those procedures."[18] Those courts concluded "[t]hat the mandate of juvenile courts to act in furtherance of the child's welfare provides the authority to make medical care decisions, including the entry of a DNR order, where the child is in the custody of the state."[19]

"The Massachusetts Supreme Court's discussion of the jurisdictional issue in the *Custody of a Minor* case is particularly relevant to the issue of the Delaware Family Court's jurisdiction. The Juvenile Court that entered [a DNR] Order in Massachusetts was, like Delaware's Family Court, a statutory court, and not . . . [a] court of general equity jurisdiction."[20] "Similarly, the Illinois Appellate Court in *In re C.A.* held that the Illinois Juvenile Court Act provided statutory jurisdiction to the Juvenile Court Judges to enter orders affecting a ward's medical treatment, including the entry of a DNR Order. The [Illinois] Court reasoned, as did the Massachusetts Court, that the juvenile court was charged with all matters presented to it regarding the welfare of the child, and that the Juvenile Court Act required court review of matters affecting the ward on a regular basis."[21]

---

[18] *Id.*
[19] *Id.*
[20] *Id.* (discussing *Custody of a Minor*, 434 N.E.2d 601, 605 (Mass. 1982)).
[21] *Id.* at 267 (discussing *In re C.A.*, 603 N.E.2d 1171, 1178 (Ill. App. Ct. 1992)).

Based upon the foregoing statutory and decisional authority, the *Truselo* Court held that the Delaware Family Court Act grants jurisdiction to the Family Court to consent to medical care decisions and that such decisions may encompass the entry of a DNR order on the child's chart, the de-escalation of medical treatment, and the withdrawal or withholding of life support measures.

Here, as in *Truselo*, the Family Court satisfied itself of jurisdiction by giving the most reasonable effect to less than ideally clear legislative authority. As we have said before, "[i]t is a well established rule of statutory interpretation that the law favors rational and sensible construction."[22] When interpreting statutory provisions, "'unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting the interpretation in favor of another which would produce a reasonable result.'"[23] To read the consortium of Delaware statutes as failing to contemplate judicial authority to issue DNR and do not reintubate orders on a child's medical chart, or otherwise consent to the withdrawal or withholding of medical treatment for minors, would lead to an irrational result that is incongruent with the statute's clear focus on ensuring that the best interests of children are protected at all times. That is to say, despite the failure of Delaware's statutory scheme to unambiguously address the foregoing

---

[22] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 343 (Del. 2012).
[23] *Id.* (quoting *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1247 (Del. 1985)).

25

issues with respect to children, it seems plain that the General Assembly did not intend to leave a void in which no judicial body possessed the authority to make all the critical decisions about medical care for a child when required to protect that child's best interests. That "'would lead to an unreasonable or absurd result not contemplated by the legislature.'"[24]

"The Delaware Family Court, like the juvenile courts in Illinois and Massachusetts, is a statutory court charged with protecting the safety and well-being of a dependent or neglected child. This mandate necessarily includes medical care decisions on behalf of a child in State custody, including those decisions that result in declining or foregoing medical treatment, when it is appropriate to do so."[25] Consequently, the decisions reached in this case and in *Truselo* – that the Family Court has subject matter jurisdiction – are reasonable interpretations of its statutory authority. It is also significant that in the fifteen years since *Truselo* was decided, the General Assembly has taken no action to modify the *Truselo* Court's interpretation of the Family Court's authority to withhold medical care. Accordingly, we hold that the Family Court's authority to de-escalate medical treatment and to withdraw life support is a logical corollary to its statutory authority to consent to medical care.

---

[24] *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (quoting *Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172, 175 (Del. 2001)). *See also Doroshow*, 36 A.3d at 342–43.
[25] *In re Truselo*, 846 A.2d at 267.

26

*Applicable Legal Standard*

Having determined that the Family Court has jurisdiction over medical care decisions for minors in State custody, as well as the authority to decide whether life support measures can be ceased and a DNR order placed on a child's medical chart, the next issue this Court must decide is the objective standard to be applied by the Family Court in making that determination. In the *Newmark* case, this Court referred to the child's "best interests."[26] The definition of "best interests" in 13 *Del. C.* § 722 relates primarily to the factors to be considered in reaching custody decisions.[27] There are no specific Delaware statutes or controlling judicial precedents that address best interests as they apply to the removal of life support systems from a minor.

While the factors set forth in Section 722 provide only limited guidance to the Family Court, several courts in other jurisdictions have relied on a definition of "best interests" that is more precisely focused on the type of medical decision that is at issue in this case. In *Truselo*, the Family Court concluded that the *In re Guardianship of Grant*[28] case provided a non-exclusive list of factors that should be considered in making a determination that life support measures should cease and medical care de-escalate:

---

[26] *Newmark*, 588 A.2d at 1116–17.
[27] 13 *Del. C.* § 722(a)(1)–(8).
[28] 747 P.2d 445 (Wash. 1997) (en banc).

27

> [E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options.[29]

We agree that the foregoing list of non-exclusive factors provides an appropriate standard for determining whether it is in a child's best interests to discontinue life support measures. These factors require the Family Court to address the specific issues that are most relevant and compelling in such difficult situations.

We must now determine the evidentiary standard to be applied in determining whether it is in a child's best interests to cease life support systems and de-escalate medical treatment. Delaware courts have held that the "clear and convincing standard of evidentiary proof is applicable in judicial proceedings involving the termination of parental rights."[30] "That standard has also been held to apply where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state."[31] "This heightened standard of evidentiary proof has also been applied in other civil proceedings involving the

---

[29] *In re Truselo*, 846 A.2d at 272 (quoting *In re Guardianship of Grant*, 747 P.2d at 568).

[30] *Id.* at 273. *See also Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."); *In re Stevens*, 652 A.2d 18, 23 (Del. 1995); *Patricia A.F. v. J.R.F.*, 451 A.2d 830, 831 (Del. 1982).

[31] *In re Truselo*, 846 A.2d at 273. *See also In re Tavel*, 661 A.2d 1061, 1070 (Del. 1995).

28

termination of important rights."[32]  Accordingly, we hold that in *Truselo* and in this case, the Family Court properly recognized the applicable standard of proof was clear and convincing evidence.

### *Application of Standard*

In this case, as in *Truselo*, the Family Court concluded that the clear and convincing evidence standard should be properly applied in determining whether it is in Adam's best interest to approve the AGAL's request to forego life sustaining medical treatment for this child.  In this case, the Family Court analyzed the best interest factors discussed in *Truselo*, as follows:

> (1) evidence about the patient's present level of physical, sensory, emotional, and cognitive functioning;

All of the testifying physicians agree that Adam's current level of functioning is very low.  Adam is unable to breathe or eat on his own.  As a result of his brain injuries, it is likely that Adam is both deaf and blind.  It is also likely that Adam will be unable to engage in any "meaningful" behavior including speaking, communicating, or forming relationships.

> (2) the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively;

---

[32] *In re Truselo*, 846 A.2d at 273. *See also In re Tavel*, 661 A.2d at 1070; *Newmark*, 588 A.2d at 1110 ("[T]he State has the burden of proving by clear and convincing evidence that intervening in the parent-child relationship is necessary to ensure the safety or health of the child, or to protect the public at large."); *William H.Y. v. Myrna L.Y.*, 450 A.2d 406, 407–08 (Del. 1982) (applying an enhanced burden of evidentiary proof to custody modifications).

29

Dr. Piatt believes that Adam is capable of reacting to pain, but does not experience it in the same manner as someone who is conscious. Similarly, Dr. Falchek testified that Adam may be able to experience pain if there is enough of the area of his brain responsible for processing pain remaining.

Adam's current treatment, including the use of an endotracheal tube and a nasogastric tube, carry the risk of infection, pneumonia, damage to the vocal chords, and erosion of any tissue coming into contact with the tubes. If these tubes are surgically replaced with tubes connected directly to Adam's neck and stomach, there is a risk of a sodium imbalance in his blood, complications associated with anesthesia, bleeding, infection, and disruption to parts of the body surrounding the surgical sites. Since Adam will never be able to breathe or eat on his own, the use of these tubes will be necessary for the rest of Adam's life.

If Adam is removed from life support he would receive "comfort care." This involves the administration of pain medication and sedation following the removal of life support until Adam passes away.

> (3) the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment;

The degree of humiliation, dependence, and loss of dignity that results from Adam's condition cannot be overstated. All of the testifying physicians agree that Adam will never walk, talk, feed himself, hear, communicate, or be able to care for himself in any way. Nor will Adam be able to eat or breathe without mechanical

30

assistance. Currently, these machines run through Adam's nose and throat. If replaced with more permanent life support systems, tubes would be inserted directly into Adam's throat and stomach. Finally, Adam will require the support of a trained caretaker twenty-four hours per day for the rest of his life.

(4) the life expectancy and prognosis for recovery with and without treatment;

The Family Court did not receive testimony concerning Adam's life expectancy, although the testifying physicians indicated that Adam will continue to live for an unknown period of time if he remains on life support. Without life support, Adam would probably die within a few days. Due to the severity and degenerative nature of his brain injuries, however, Adam will never recover or function in an age-appropriate manner. There is no treatment able to restore Adam's brain functioning.

(5) the various treatment options;

The only treatment option available to Adam is the continuation of life support along with daily care from trained professionals. As stated above, there is no treatment capable of repairing the damage to Adam's brain.

(6) and the risks, side effects, and benefits of each of those options.

Again, use of endotracheal and nasogastric tubes carry the risk of infection, pneumonia, damage to the vocal chords, and erosion of any tissue coming into contact with the tubes. If these tubes are surgically replaced with tubes connected

31

directly to Adam's neck and stomach, there is a risk of a sodium imbalance in his blood, complications associated with anesthesia, bleeding, infection, and disruption to parts of the body surrounding the surgical sites. If enough of Adam's thalamus still exists, then it is possible that the life support systems could cause Adam pain. While it may be maintained that Adam's life is a benefit of his treatment, such a position must be assessed in light of his current level of functioning and future prognosis.

For these reasons, the Family Court concluded that the tragic consequences of allowing Adam to remain on life support are great, and far outweigh the rewards of furthering his life. Therefore, on August 13, 2015, the Family Court found by clear and convincing evidence that it is in the best interests of Adam to de-escalate his medical care, withdraw life support, enter DNR and Do Not Re-Intubate Orders on his medical chart, provide him with comfort care, and allow him to die in peace. The most recent opinion of the Family Court appointed independent medical expert supports that August 13, 2015 decision.

### *No Termination of Parental Rights*

Mother and Father next question whether the Family Court has the authority to de-escalate medical care for Adam because their parental rights have not been terminated. When a child is placed in DFS custody, the Division has the right to "consent to medical care for the child, including medical examination, medical

32

treatment including surgical procedures."[33]   However, DFS is required to make

"reasonable efforts to obtain the consent of the parent and to notify the guardian *ad*

*litem*, prior to obtaining medical care."[34]   While parents retain the right to consent

to certain medical treatment under Section 2520(b), that right is held *"unless*

*otherwise ordered by the [Family] Court . . . ."*[35]

Although Mother and Father argue that the Family Court cannot override a

parent's objection, even in the case of abuse, prior to a termination of parental

rights, other jurisdictions have recognized that parents rights are not absolute.  In

*In re Christopher*,[36] the child suffered serious brain damage at the hands of his

father, while his mother was in the home.[37]   Christopher was removed from the

custody of his parents and placed into protective custody.[38]   As a result of his

injuries, mother filed a petition for removal of life support and imposition of a

DNR order; father opposed both requests.[39]   The court stated that "[w]hile it would

generally be the right of Christopher's parents to make the determination of what

medical treatment (or cessation thereof) is in his best interests, . . . [the parents], by

their actions, *forfeited their rights* to determine what is and is not in Christopher's

---

[33] 13 *Del. C.* § 2521(2).
[34] *Id.*
[35] 13 *Del. C.* § 2320(b) (emphasis added).
[36] 131 Cal. Rptr. 2d 122 (Cal. Ct. App. 2003).
[37] *Id.* at 126.
[38] *Id.*
[39] *Id.* at 126–27.

best interests."[40]  The court found that it had the authority to act even when parental rights were still intact because father's actions directly caused Christopher's current vegetative state and, further, that mother failed to protect Christopher from harm.[41]

Similarly, in *In re Arzuaga-Guevara*, the Court of Chancery noted that a termination of parental rights of the abusive parent before ordering withdrawal of life support to a child in a persistent vegetative state was "not as practical to the ends of justice and its prompt administration."[42]  In *In re K.I.*,[43] the appellate court specifically found that the child's well-being took precedent over the mother's parental rights in affirming the trial court's decision to enter a DNR order of a child that was "neurologically devastated."[44]  The court in *K.I.* acknowledged that biological parents do not lose their "'fundamental liberty interest . . . in the care, custody and management of their child'" because they have lost temporary custody to the state.[45]  However, the court also recognized that the parents' interest is not absolute.  "'The paramount concern is the child's welfare and all other

---

[40] *Id.* at 138 (emphasis added).
[41] *Id.* at 138–39.
[42] *In re Arzuaga-Guevara*, C.M. No. 10211 (Del. Ch.), *aff'd on other grounds*, 794 A.2d 579 (Del. 2001).
[43] 735 A.2d 448 (D.C. 1999).
[44] *Id.* at 450.
[45] *Id.* (quoting *Santosky*, 455 U.S. at 753).

considerations, including the rights of a parent to a child, must yield to its best interests and well being.'"[46]

At the time the Family Court granted the Motion to De-Escalate Medical Treatment, Adam had been found both neglected and abused in his parents' care. "[O]nce a child has been adjudicated dependent or neglected, the Family Court, in its role as *parens patriae*, is charged with ensuring the safety and well-being of that child, including . . . decisions involving medical treatment."[47] "[W]here the parents have failed to exercise their parental responsibilities toward the child, or in cases of suspected abuse or neglect, the parents' right to speak for the child may be diminished, or even lost entirely."[48]

In *Truselo*, the Family Court recognized that the parents of the child at issue had consented to the removal of life support. Nevertheless, the *Truselo* Court stated that an agreement between the parents concerning a child's medical treatment "neither defeats the jurisdiction of the [Family] Court in a case such as this nor binds it to accept their position."[49] Accordingly, the *Truselo* Court stated that the ultimate issue is "who is in the best position to decide (and who gets to decide who will decide)."[50] In resolving this question, the *Truselo* Court relied

---

[46] *Id.* at 454 (quoting *Davis v. Jurney*, 145 A.2d 846, 849 (D.C. 1958)).
[47] *In re Truselo*, 846 A.2d at 269.
[48] *Id.* (internal quotation omitted).
[49] *Id.*
[50] *Id.*

primarily on the fact that custody of the child had been granted to DFS following a finding of dependency.[51] The *Truselo* Court stated that, "[w]hile the [Family] Court's decision weighs less heavily [when there is parental consent], the fact remains that [the child] is under the jurisdiction of the Family Court, and as such, [the Family] Court, in its role as *parens patriae,* has a duty to ensure that medical treatment decisions serve his best interests."[52]

Here, Mother and Father have been adjudicated to have abused and neglected Adam. The Family Court also noted that Mother and Father are the primary suspects in the criminal investigation of Adam's injuries and admitted that no one else had been responsible for Adam's care. In applying the *Christopher* analysis, Mother and Father have "forfeited their rights to determine what is or is not in [Adam's] best interests."[53] On August 18, 2015, the Family Court granted DFS' Motion for Determination of No Reasonable Unification Efforts, which was filed on June 19, 2015. The Family Court found by clear and convincing evidence that DFS is not required to perform reunification and other services to either parent with respect to Adam and his brother, due to Adam's serious physical injury and near death while in his parents' care. The Family Court cited the termination of

[51] *Id.* at 270.
[52] *Id.*
[53] *In re Christopher*, 131 Cal. Rptr. 2d at 138.

parental rights statute.[54]   Thus, although there had not been a termination of parental rights, the Family Court has already adjudicated Mother and Father to have abused and neglected Adam, and found by clear and convincing evidence that grounds for termination of parental rights exist in 13 *Del. C.* § 1103(a)(8) because of Adam's serious injuries and near death: "injury or death resulting from intentional, reckless, willful neglect of parent."

It is particularly significant that the Delaware termination of parental rights statute states "nothing herein shall prevent a court from immediately assuming custody of a child and ordering whatever action may be necessary, *including medical treatment*, to protect his or her health and *welfare*."[55]   Accordingly, we hold that the Family Court had authority to act on the Motion to De-Escalate Medical Treatment, under the facts of this case, even though there had been no termination of parental rights.

### *Parents Afforded Due Process*

Parents are entitled to due process prior to the entry of an order that effectively terminates their parental rights.  Such due process necessarily includes adequate notice.[56]  According to Delaware decisional law:

> Procedural due process requires that parties whose rights
> are to be affected are entitled to be heard; and in order

---

[54] *See* 13 *Del. C.* § 1103.
[55] 13 *Del. C.* § 1103(c) (emphasis added).
[56] *Orville v. Div. of Family Serv.*, 759 A.2d 595, 598 (Del. 2000).

that they may enjoy that right they must first be notified. The right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. The notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the dependency of the action and afford them an opportunity to present their objections.[57]

Though he was not personally served with notice of the hearing, Father appeared at the Family Court for the hearing on June 30, 2015. Mother also appeared. The Family Court found Father to be indigent and formally appointed counsel. Counsel for Father then requested a continuance based on the severity of the matters before the court, her formal appointment as counsel that morning, and service of the pleadings upon Father before the hearing started. The AGAL opposed the continuance request, as did DFS. Counsel for Mother supported the continuance request, though did not request a continuance on Mother's behalf. In denying the request for a continuance, the Family Court noted that the child had been in foster care for about a month, questioned where Father had been during that time, and also noted that there would be some amount of "unpreparedness" because of the expedited nature of the emergency proceedings.

The Family Court's decision to deny a continuance is reviewed for an abuse of discretion.[58] In this case, the Family Court's denial of Father's continuance

---

[57] *Tsipouras v. Tsipouras*, 677 A.2d 493, 496 (Del. 1996) (internal citations and quotations omitted).
[58] *Smith v. State*, 582 A.2d 936 (Del. 1990).

request was not unreasonable or capricious. The record reflects that the Family Court properly weighed Father's due process concerns against the emergency nature of the proceeding.

Father now argues that his initial lack of preparation at the June 30, 2015 hearing on the Motion to De-Escalate Medical Treatment supports a finding of ineffective assistance of counsel by the time the Family Court issued its final order on the Motion to De-Escalate Medical Treatment on August 13, 2015. However, after the June 30, 2015 hearing, when the Family Court denied the Motion to De-Escalate Medical Treatment on an emergency basis, Father and Mother were aware that the Family Court planned to readdress the issue, where appropriate, at a later date. Following the June 30, 2015 hearing, the Family Court granted the parents' request to obtain an independent medical expert. The Family Court's denial of the Motion to De-Escalate Medical Treatment on an emergency basis gave counsel for Father and Mother an opportunity to prepare for the subsequent proceedings.

On August 10, 2015, during a teleconference regarding the status of the independent medical examination requested by the parents at the close of the June 30, 2015 hearing, the AGAL renewed its request that the still-pending Motion to De-Escalate Medical Treatment be again considered by the Family Court. The parents requested more time to continue to search for an independent expert to evaluate Adam. The Family Court asked counsel for the parties if it needed to take

39

any more evidence other than the independent medical examination the parents had requested. Counsel for the parents agreed that, but for any evidence of the second opinion, there was no need for further evidence and the parties declined to add any further positions on the motion. The parties stipulated the evidence from the June 30, 2015 hearing was admissible into evidence. The Family Court granted the Motion to De-Escalate Medical Treatment on August 13, 2015.

On July 23 and 28, 2015, the Family Court held an Adjudicatory Hearing. Mother and Father were both represented by counsel at that proceeding. On August 11, 2015, the Family Court issued its Order from the Adjudicatory Hearing, finding by a preponderance of the evidence that James was neglected and Adam was neglected and abused in the care of the parents. Custody of both children was awarded to DFS. On August 18, 2015, the Family Court granted DFS's Motion for Determination of No Reasonable Reunification Efforts, which was filed on June 19, 2015. Both parents were represented by counsel and given an opportunity to address the motion. The Family Court found by clear and convincing evidence that DFS was not requested to perform reunification with the parents for Adam or his brother due to Adam's physical injury and near death while in the parents' care.

The record reflects that throughout all of the proceedings both parents were represented by counsel, given notice, and granted an opportunity to be heard at a

meaningful time and in a meaningful manner. Accordingly, we hold that both parents were afforded due process.

### *Independent Medical Examination Discretionary*

No statutory authority in Delaware specifically entitles a parent involved in child welfare proceedings to have an independent medical evaluation or assessment performed on a child prior to the Family Court issuing a decision to de-escalate medical treatment. Nevertheless, in this case the Family Court did initially grant the parents' request for an independent medical examination of Adam.

Courts in other jurisdictions appear to have different approaches to the permissibility or necessity for an independent medical examination when a de-escalation of care, or "do not resuscitate order" is sought. In *Christopher*, the mother who filed for an order authorizing a DNR order and removal of the child's life sustaining medical treatment presented the testimony of three of the child's treating physicians, as well as two independent pediatric neurologists.[59] Conversely, in *Care and Protection of Beth*, the testimony of an independent evaluator was not sought.[60] In that case, the main witness at an evidentiary hearing concerning the child's future medical care was the child's primary treating

---

[59] *In re Christopher*, 131 Cal. Rptr. 2d at 127–28.
[60] *Care & Protection of Beth*, 587 N.E.2d 1377 (Mass. 1992).

41

physician.[61] The director was the physician primarily responsible for the child's care from the time she was admitted.[62] In that Massachusetts case, though the entry of a "no code order" was in dispute, the court took testimony only from the child's treating physician and relied on that in authorizing the entry of a DNR order.[63]

On August 10, 2015, five weeks after its initial decision to deny the emergency Motion to De-Escalate Medical Treatment, the Family Court conducted a teleconference with counsel for all parties to discuss the status of the independent medical examination. During that time frame, four hospitals in three major metropolitan areas and two additional physicians declined to perform such an examination. Despite their significant and collective efforts, and the considerable extent of their search, counsel were not successful in retaining a willing or available qualified expert not affiliated with A.I. duPont to perform an independent evaluation.

While the Family Court initially had concerns that Dr. Falchek was not sufficiently independent, because of his employment by A.I. duPont Hospital for Children, it resolved those concerns after carefully reconsidering the evidence. The Family Court found the testimony of the four doctors credible and that there

---

[61] *Id.* at 1379.
[62] *Id.*
[63] *Id.* at 1383.

was no evidence of collusion amongst them. Moreover, despite having given Mother and Father five weeks to attempt to locate a qualified physician to perform an independent examination, no expert had yet been found. While the parents asked for more time to attempt to locate such an expert, neither the Family Court nor counsel could determine what amount of time might be appropriate. The Family Court concluded that while an independent examination is good practice, it was not necessary under the circumstances.

The Family Court determined that Adam's best interests would not be served, and would in fact be disregarded, if the search for an independent evaluator were to continue in perpetuity, stating "the court must therefore weigh the harm associated with providing more time . . . against the benefits of obtaining another opinion. The court finds that the balance now favors moving forward without a fifth evaluation." The Family Court noted that there "have been no allegations or evidence indicating that the testifying physicians have engaged in any sort of collusion or impropriety. All four of the physicians who testified in this case provided an almost identical assessment of [Adam's] condition and prognosis. The certainty in each of those opinions led the Family Court to believe that a fifth evaluation would not result in a different opinion." The Family Court concluded:

> This case presents one of the most difficult, profound,
> and somber issues a Court can face. As such, it is
> preferred that the decision of whether to remove a child
> from life support be made by the child's parents. When

43

the parents are responsible for the child's condition, however, the Court must assume the parental role and determine what is in the child's best interests. Here, the undisputed medical testimony establishes that Adam will never recover from his injuries. In order to stay alive, Adam must be connected to invasive and potentially painful life support systems which must be monitored by trained caretakers twenty-four hours per day. As a result of his injuries, Adam will never walk, talk, hear, or see. Nor will he ever engage in any sort of meaningful behavior. It is also important to note that DFS supports the position of the guardian *ad litem* despite the countervailing interest which the State may have in preserving the life of its citizens.[64]

In this case, we need not decide if the Family Court properly proceeded without the opinion of a fifth physician who was an independent medical expert because during the pendency of this appeal such an opinion was provided by a Family Court appointed independent medical expert. The opinion of that independent medical expert was in complete accord with the medical expert opinions of the four other physicians.

Nevertheless, it is appropriate for this Court to provide guidance for proceedings in the future when the Family Court is called upon to decide whether to withhold or withdraw life support for a child and to de-escalate medical

---

[64] According to the Policy Manual for Division of Family Services, "Unless parental rights have been terminated or legal guardianship transferred by the Court, parents maintain the right to consent to any medical treatment." Div. Family Serv., Policy Manual, Mar. 2015, at C-2. The Policy Manual goes on to specifically state that "[t]he Division cannot sign or consent for medical . . . treatment required for a child in the following circumstances . . . . Life Ending Decisions, including 'Do Not Resuscitate' orders or removal of life support." *Id.* at C-5(e).

treatment. We decline to hold that an independent medical expert is required in all cases. In this case, however, the Family Court concluded that it was desirable to have the opinion of an independent medical expert. The parties were unable to obtain the opinion of an independent medical expert over the course of five weeks. The Family Court then decided to proceed on the basis of the four medical opinions that were on the record. In other cases, the Family Court might properly decide to do that *ab initio*.

But, in this case the Family Court had already decided that a fifth expert medical opinion was desirable. When the parties were unsuccessful in obtaining an independent medical expert, the Family Court should have appointed its own independent medical expert, if possible. That was ultimately done in this case. In future cases, if the Family Court decides that the opinion of an independent medical expert is desirable, it can appoint one immediately, even if it decides, as in this case, to give the parties a reasonable amount of time to obtain an independent medical expert's opinion.

### Conclusion

The August 13, 2015 judgment of the Family Court is affirmed. The mandate shall issue immediately.