IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE         :
                                 :

v.                          :       I.D. No. 1512005902
                                 :

CASEY LAYTON             :

## MEMORANDUM OPINION

*Upon Defendant's Motion in Limine.  Denied.*
*Upon the State's Motion in Limine to Determine Admissibility Pursuant to the Delaware Rules of Evidence.  Granted in part.*

Date Submitted:  October 30, 2017
Date Decided:  December 6, 2017

Melanie C. Withers, Esq., Deputy Attorney General, 114 E. Market Street, Georgetown, DE 19947.

Natalie S. Woloshin, Esq., Woloshin, Lynch, & Associates, P.A., 3200 Concord Pike, P.O. Box 7329, Wilmington, DE 19803.

**STOKES, J.**

## I.     INTRODUCTION

Before the Court are the pretrial motions submitted in this case. The Court will address the Defendant's Motion in Limine and the State's Motion in Limine *seriatim*. Defendant, Casey Layton's ("Defendant" or "Layton"), Motion in Limine is, in essence, a motion to dismiss. She seeks to have count two of the indictment, Murder by Neglect, dismissed for unconstitutional vagueness. For the reasons expressed below, the Motion is **DENIED**. The State's Motion in Limine seeks a determination of the admissibility of certain evidence to be used in its case-in-chief. For the reasons expressed below, portions of the evidence in question are admissible. The State's Motion is **GRANTED IN PART.**

## II.     FACTS AND PROCEDURAL HISTORY[1]

The victim, Aiden Hundley ("Aiden"), was born on February 19, 2015 addicted to narcotics. After a four week stay in the hospital to be weaned from drugs, Aiden was released to his parents, Doyle J. Hundley ("Hundley") and Casey Layton. The Division of Family Services ("DFS") became involved with this family after Aiden's birth.

When Aiden was barely three months old, emergency personnel were called to Hundley and Layton's home in Harbeson, Delaware. On May 23, 2015, Aiden was found to be unconscious, unresponsive, and his face and lips were blue. He was ventilated with a mask and bag, and an IV was begun through a hole drilled in his leg. He was transported to Beebe Hospital in Lewes.

---

[1] The facts and procedural history are taken from the September 16, 2015 decision of the Delaware Supreme Court. The Supreme Court used pseudonyms to protect the identity of the parties involved in this case while the child was still alive. This Court has reverted back to using the given names of those involved. Additionally, the State has supplied over 10,000 pages of medical records, reports, and other documentation for this case. All of the information set forth by the Supreme Court decision is contained in those pages. The information relied upon by the State has been presented to both the defense and the Court. *Hunt v. Division of Family Services*, 146 A.3d 1051 (Del. 2015).

Neither Hundley nor Layton offered an explanation as to why Aiden was unconscious and unresponsive. Neither Hundley nor Layton accompanied Aiden to the hospital. Layton eventually went to the hospital with a police officer; Hundley never went to the hospital.

Aiden was immediately transferred from Beebe Medical Center to Nemours/Alfred I. DuPont Hospital for Children ("A.I. DuPont") in Wilmington, Delaware. On May 26, 2015, Dr. Allan DeJong, the medical director of A.I. duPont's child abuse program, and an expert in child abuse pediatrics and medical evaluation of children for abuse and neglect examined Aiden. Dr. DeJong opined that Aiden sustained multiple fracture caused by unexplained abusive trauma. In addition to multiple fractures, Aiden's other diagnoses included chronic bilateral subdural hematomas, destruction of brain tissue, seizures, respiratory failure, malnourishment, and splitting of the layers of the retina of his left eye.

On May 28, 2015, DFS filed a Dependency/Neglect Petition for Custody, requesting emergency ex parte custody of Aiden. The petition alleged that Aiden was neglected and abused in the care of his parents. DFS asserted that Aiden had been hospitalized for serious physical injuries. Because his parents were suspects in this abuse, the Family Court awarded emergency custody of Aiden to DFS.

On May 28, 2015, the Family Court appointed Kim DeBonte, Esq., of the Office of the Child Advocate, as Aiden's attorney guardian *ad litem* ("AGAL").

On June 4, 2015, the Family Court held a Preliminary Protective Hearing. Layton appeared, but Hundley did not. Service of process had not yet occurred on Hundley. The Family Court found Layton to be indigent and appointed counsel on her behalf. Layton consented to a finding of probable cause that Aiden, as well as his older brother, Jaxsun Hundley, continued to be in actual physical, mental, or emotional harm, or there was a substantial imminent risk thereof.

3

The Family Court received testimony that Aiden had suffered extensive injuries and would likely require institutional care and/or life support for the remainder of his life. Due to Aiden's injuries, as well as concerns as to the nature of the care being provided by Layton and Hundley, the Family Court found that probable cause existed to believe that both children continued to be in actual physical, mental, or emotional danger with regard to Hundley. The Family Court also found that DFS had made reasonable efforts to prevent the unnecessary removal of the children from their home. Accordingly, the Family Court continued temporary custody of both children with DFS. The Family Court ordered genetic testing of both children. The Family Court also scheduled an Adjudicatory Hearing.

On June 26, 2015, the AGAL filed a Motion to De-Escalate Medical Treatment, in which she requested a hearing to determine whether it was in Aiden's best interest to de-escalate his medical intervention. The Motion stated that Aiden had been diagnosed with numerous medical conditions which were highly characteristic of non-accidental trauma. As a result of his injuries, Aiden was placed on life support. Layton visited Aiden twice in June after his admission to A.I. DuPont and cancelled other scheduled visits without providing an explanation. Hundley did not visit Aiden once in June or contact DFS to schedule a visit.

Attached to the Motion to De-Escalate Medical Treatment were several affidavits from Aiden's Physicians at A.I. DuPont, all of which concluded that it would be in Aiden's best interest to de-escalate his medical treatment and to provide "comfort care" instead. Layton had been informed of Aiden's prognosis, but indicated that she did not wish to withdraw care.

On June 30, 2015, the Family Court held an emergency hearing to receive evidence concerning the Motion to De-Escalate Medical Treatment. Layton had been personally served with notice of the hearing on June 27, 2015, and she was present with counsel. Hundley had not

4

been personally served, but appeared anyway. The Family Court found Hundley to be indigent and appointed counsel on his behalf. Hundley's attorney requested a continuance, arguing that she had just met Hundley, only learned of the hearing the previous day, and did not have time to prepare for a hearing with such significant consequences. The Family Court denied the request.

On July 6, 2015, the Family Court issued its Order from the June 30 hearing, denying the Motion to De-Escalate Medical Treatment due to a lack of evidence indicating that Aiden was at risk of immediate and irreparable harm as well as the absence of a finding of dependency, neglect, or abuse. The Adjudicatory Hearing had not yet been held, and therefore a finding of dependency, neglect, or abuse had not yet been made. The Family Court's Order stated that Layton and Hundley would be permitted to seek an independent medical expert's opinion of Aiden's condition, and that the Motion would be re-addressed at an appropriate time.

On July 23 and 28, 2015, the Family Court held an Adjudicatory Hearing with regard to Aiden and Jaxsun. Both parents were represented by counsel. During the hearing, evidence was presented that Aiden was born addicted to narcotics and spent four weeks in the hospital. The evidence also revealed that Aiden was in the exclusive control of Layton and Hundley at the time he sustained his injuries, and that it was not possible for Aiden to cause the harm to himself. Lastly, the evidence showed that Layton and Hundley failed to seek medical attention for Aiden despite obvious signs that he was severely injured.

On August 10, 2015, the Family Court held a teleconference with counsel for Layton and Hundley, DFS, and Aiden's AGAL. The primary purpose of the teleconference was to determine the status of an independent medical examination requested by Layton and Hundley at the conclusion of the June 30, 2015 hearing. The Family Court was informed that an independent examination of Aiden had not been performed.

5

Counsel for Layton and Hundley stated that The Children's Hospital of Philadelphia, Johns Hopkins of Baltimore, St. Christopher's Hospital for Children ("St. Christopher's") in Philadelphia, and the Children's National Medical Center ("CNMC") in Washington, D.C. all declined to perform the evaluation. The Family Court and counsel engaged in a discussion as to the purpose of an independent medical examination. Counsel for Layton responded that such an examination is required due to the finality of the Family Court's decision. The AGAL asserted that it is simply good practice. The AGAL also asserted, however, that it is her position that an independent assessment of Aiden's condition was performed by Dr. Stephen Falchek. Dr. Falchek is the Chief of Pediatric Neurology at A.I. duPont. The AGAL explained that there are very few pediatric neurologists in the area not associated with A.I. duPont and that Dr. Falchek had never been involved with Aiden's treatment.

At the conclusion of the teleconference, the AGAL renewed her Motion to De-Escalate Medical Treatment. Additionally, all of the parties agreed that there was no additional evidence or argument to be presented in this matter other than the results of an independent medical examination, if one was performed.

On August 11, 2015, the Family Court issued its Order from the Adjudicatory Hearing, finding that Jaxsun was neglected in the care of his parents, and that Aiden was neglected and abused in that care of his parents. Accordingly, the Family Court awarded custody of both children to DFS.

On August 13, 2015, the Family Court issued a decision addressing the Motion to De-Escalate Medical Treatment. The Family Court found that an examination of Aiden's condition by a physician completely unaffiliated with A.I. duPont was not required prior to resolving the Motion. The Family Court found that there was no indication that Dr. Falchek's employment with

6

A.I. duPont affected his ability to perform an independent examination of Aiden's condition. Dr Falchek had little knowledge of Aiden or his condition prior to his examination. He swore to his independence under penalty of perjury. There were no allegations or evidence indicating that the testifying physicians had engaged in any sort of collusion or impropriety. All four of the physicians who testified in this case provided an almost identical assessment of Aiden's condition and prognosis. The certainty in each of those medical opinions led the Family Court to believe that a fifth examination would not result in a different opinion. The Family Court also noted that this case was time sensitive, as Aiden's condition was deteriorating, and his current life support systems were nearing the end of their sustainability. Therefore, the Family Court ordered that the parties could move forward without a fifth medical evaluation.

The decision of the Family Court was appealed to the Delaware Supreme Court. On September 4, 2015, the Supreme Court remanded the case and directed the Family Court to appoint an independent medical expert to examine Aiden and provide an opinion concerning his diagnosis, prognosis, and recommended course of treatment. Dr. Richard Fisher of Christiana Health Care Systems was appointed to conduct the analysis. On September 9, 2015, Dr. Fisher submitted his opinion to the Family Court. He concurred with the opinions of the four other doctors who had previously performed examinations of Aiden.

The case was then sent to the Supreme Court to determine whether the Family Court had jurisdiction to order the de-escalation of Aiden's medical treatment and whether the Family Court applied the proper legal standard when making the determination. On September 16, 2015, the Supreme Court held that the Family Court did have jurisdiction to order the de-escalation of medical treatment and that the Court has properly done so. Following the issuance of the Supreme Court's opinion, Aiden was taken off life support. He died on September 22, 2015.

7

Thereafter, Defendant was charged with one count each of Murder by Abuse[2], Murder by Neglect, and Endangering the Welfare.

She now seeks to have the Murder by Neglect charged dismissed for being unconstitutionally vague. The applicable statute reads:

(a) A person is guilty of murder by abuse or neglect in the first degree when the person recklessly causes the death of a child:
    (1) Through an act of abuse and/or neglect of such child; or
    (2) When the person has engaged in a previous pattern of abuse and/or neglect of such child.[3]

Additionally, the State seeks a determination regarding the admissibility of certain prior bad act evidence.

### III.   DISCUSSION

*A.  11 Del. C. § 634 Is Not Unconstitutionally Vague*

According to Defendant, the statute in question is void for vagueness because § 634(a)(1) requires a causal link between the alleged act of abuse and/or neglect and the child's death, while § 634(a)(2) does not require there to be a causal link between the previous pattern of abuse and/or neglect and the death. Defendant believes that, as a result, "a person could be charged and convicted for a Class A felony when his or her prior neglect did not cause the death of a child."[4] Accordingly, the statute does not provide fair notice of the prohibited behavior and encourages arbitrary enforcement of the law because it allows for the "prosecution of defendants who previously engaged in a pattern of abuse completely unrelated to the child's death."[5]

---

[2] The State later entered a *nolle prosequi* on this charge. Hundley entered a plea to resolve his charges related to this case on May 8, 2017. He pled guilty to Murder by Neglect in the First Degree. The State entered a *nolle prosequi* for the charges of Murder by Abuse and Endangering the Welfare. Hundley's sentencing is deferred until Layton's charges are resolved.

[3] 11 *Del. C.* § 634(a).

[4] Def.'s Mot. Dismiss 9.

[5] *Id.* at 10.

The State argues that the statute is not unconstitutionally vague, so the charge should not be dismissed. In the State's view, the "…statute puts the defendant on notice that it is a crime to recklessly cause the death of a child when she engages in a pattern of neglect of the child."[6]

The factors that a court must analyze when considering whether a statute is unconstitutionally vague are well-settled law. The Supreme Court, in *Hoover v. State,* explained:

> "A statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated behavior is forbidden" or "if it encourages arbitrary or erratic enforcement." This Court applies a two-step analysis to determine whether a criminal statute is unconstitutionally vague. First, we consider whether the terms of the statute are sufficiently explicit to inform those subject to the statute of the prohibited conduct. Second, we consider whether the terms of the statute are so vague that persons of common intelligence must guess at the statute's meaning and would differ as to its application.[7]

Additionally, it is established law in Delaware that legislation enacted by the General Assembly is presumptively constitutional.[8] When possible, the Court should read a statute to be consistent with the legislative intent as well as ensure that the interpretation does not lead to absurd results, generally by giving the "language its reasonable and suitable meaning."[9]

Here, there is no question that the statute is detailed enough to alert a potential offender of the prohibited behavior, and it does not encourage arbitrary or erratic enforcement. The statute makes clear that a person is guilty of Murder by Neglect if his or her reckless behavior constituted a previous pattern of abuse or neglect of the victim child, which ultimately culminated in the child's death. The fact that the word "when" is used instead of the word "through" is inconsequential. A person of ordinary intelligence would still understand the provision to mean that a previous pattern of abuse and/or neglect would have to cause the child's death, regardless of

---

[6] State's Br. Supp. Opp'n Def.'s Mot. Dismiss 2.
[7] *Hoover v. State*, 958 A.2d 816, 820-21 (Del. 2008) (internal citations omitted).
[8] *Snell v. Engineered Systems & Designs, Inc.*, 669 A.2d 13, 17 (Del. 1995) (internal citations omitted).
[9] *State v. Sailer*, 684 A.2d 1247, 1250 (Del. 1995) (internal citations omitted).

which word is used. Reasonable minds would not differ as to the application of the law. Furthermore, since the statute does not allow for the prosecution of defendants who previously engaged in a pattern of abuse and/or neglect unrelated to the child's death, there is no risk that it will be applied arbitrarily or erratically. Thus, the statute is not unconstitutionally vague.

Considering the foregoing, Defendant's Motion in Limine is **DENIED**.

B. *Portions of the Evidence Sought to be Admitted by the State will be Admissible at Trial*

The State seeks to have certain evidence of Layton's prior bad acts admitted at trial. Therefore, the State now seeks a determination of whether the prior bad act evidence will be admissible at trial. The evidence reasonably anticipated includes:

1. Evidence that Defendant consumed opiates and other illegal drugs while pregnant with two other children, one of whom was removed from her care by DFS due to severe neglect and drug abuse on the part of the Defendant.

2. Evidence that Defendant consumed illegal and non-prescribed opiates as well as vast quantities of legally prescribed drugs while she was pregnant with Aiden. The State would also like to introduce evidence proving that Aiden was born drug dependent, causing his month-long stay in the hospital.

3. Evidence that Defendant was aware that DFS had opened a case on her family as a result of Aiden being born drug dependent and Defendant chose to hide Aiden from the DFS worker.

According to Delaware Rule of Evidence 404(a), evidence of Defendant's character may not be introduced to show that she acted in conformity therewith on a particular occasion.[10] However, Rule 404(b) lays out an exception to this rule, stating: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

---

[10] D.R.E. 404(a).

10

It may, however, be admissible for other purposes, such as proof of motive opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."[11] The State seeks to have this evidence admitted under Delaware Rule of Evidence 404(b) for several purposes other than to prove propensity. Those purposes include: (1) to provide the jury with Layton's background; (2) motive; (3) plan or opportunity; (4) the absence of accident or mistake; (5) to demonstrate Layton's state of mind; and (6) because the prior bad acts are inextricably intertwined with the reckless state of mind and overall neglect.[12]

Layton opposes the admission of such evidence. She claims that the State "has thrown the kitchen sink of purposes at the Court."[13] Layton argues that some of the allegations made by the State are false and that the State's contentions are not proven by plain, clear, and convincing evidence. Furthermore, according to Defendant, the State has not identified any specific instances of abuse to constitute a pattern of neglect. Lastly, Layton asserts that the evidence sought to be presented by the State only serves to prove propensity, not to serve one of the permissible Rule 404(b) purposes.

However, the Court does not view this question as one falling definitely under Rule 404(b). When the evidence of a prior bad act is necessary to prove an element of the offense charged, it is admissible.[14] Such evidence falls outside of the scope of Rule 404. Therefore, the Court must analyze the Murder by Neglect statute and determine what types of evidence would need to be presented in order the establish the elements of the offense. Before continuing with the analysis,

---

[11] D.R.E 404(b).
[12] State's Br. Supp. Mot. in Limine 9.
[13] Answering Br. Opp'n State's Mot. in Limine 2.
[14] *Taylor v. State*, 777 A.2d 759, 764 (Del. 2001) ("In order to introduce evidence of other crimes in the State's case-in-chief, those crimes must be logically relevant not just to 'an issue or ultimate fact in dispute in the case,' but to 'an issue or ultimate fact *to be proved in the State's case-in-chief.'*").

it is helpful for the Court to review the Murder by Neglect statute as well as some pertinent definitions.

Section 634 of Title 11 states:

> (a) A person is guilty of murder by abuse or neglect in the first degree when the person recklessly causes the death of a child:
>    (1) Through an act of abuse and/or neglect of such child; or
>    (2) When the person has engaged in a previous pattern of abuse and/or neglect of such child.[15]

"Neglect" is defined by § 901 of Title 10 as follows:

> "Neglect" or "neglected child" means that a person:
>    (a) Is responsible for the care, custody, and/or control of the child; and
>    (b) Has the ability and financial means to provide for the care of the child; and
>        1. Fails to provide necessary care with regard to: food, clothing, shelter, education, health, medical or other care necessary for the child's emotion, physical, or mental health, or safety and general well-being; or
>        2. Chronically and severely abuses alcohol or a controlled substance, is not active in treatment for such abuse, and the abuse threatens the child's ability to receive care necessary for that child's safety and general well-being; or
>        3. Fails to provide necessary supervision appropriate for a child when the child is unable to care for that child's own basic needs or safety, after considering such factors as the child's age, mental ability, physical condition, the length of the caretaker's absence, and the context of the child's environment.[16]

"Necessary care" is defined as follows:

> "Necessary care" means a type and degree of personalized attention that will tend to advance a child's physical, mental, emotional, moral, and general well-being.[17]

A "previous pattern" of neglect is defined as follows:

> "Previous pattern" of abuse and/or neglect shall mean two or more incidents of conduct:
>    (a) That constitute an act of abuse and/or neglect; and

---

[15] 11 *Del. C.* § 634(a).
[16] 10 *Del. C.* § 901(18).
[17] 10 *Del. C.* § 901(17).

(b) Are not so closely related to each other or connected in point of time and place that they constitute a single event.[18]

First, the Court must examine whether any of the evidence sought to be presented proves an element of the offense charged, bringing it out of the ambit of Rule 404. As previously stated, when the evidence of a prior bad act is necessary to prove an element of the offense charged, it is admissible.[19] Here, a person is guilty of murder by neglect when he or she recklessly engaged in a previous pattern of neglect that resulted in the death of a child.[20] Thus, by the nature of the statute, the State will have to introduce evidence of Layton's pattern of neglect, which will necessarily involve prior bad acts. In essence, the only way that the State will be able to demonstrate that Layton engaged in a pattern of neglect will be to introduce evidence that would typically be prohibited by Rule 404(a). Yet, this is permitted given that the evidence is essential to proving Defendant's guilt. However, there are limitations on what evidence may be considered by the jury.

Here, there are several incidents which may be presented to the jury in order to demonstrate Defendant's pattern of neglect. First, it is helpful to return back to the definition of neglect, as laid out in § 901. In order to fall into the definition, the person charged must have been responsible for the "care custody, and/or control of the child."[21] It is undisputed that Layton and Hundley were the only people taking care of Aiden during the time between his release from Beebe Medical Center and his admission to A.I. duPont. Thus, Layton and Hundley both were responsible for Aiden's care at all pertinent times.

---

[18] 11 *Del. C.* § 634(b)(3).
[19] *Taylor*, 777 A.2d at 764.
[20] 11 *Del. C.* § 634.
[21] 10 *Del. C.* § 901.

Additionally, Defendant meets the second part of the definition, as laid out in § 901(18)(b)(1). Layton failed to provide Aiden with the basic essentials necessary to sustain life. She did not adequately feed the child, only offering him a bottle propped up on a towel in his bassinet.[22] As a result, Aiden was malnourished upon his admission to A.I. duPont.[23] Furthermore, Layton failed to provide Aiden with essential medical care. Despite observing the actual abuse Aiden suffered as well as the aftermath of such abuse, Defendant did nothing to provide Aiden with medical aid.[24] Further, when leaving Aiden alone with Hundley she arguably failed to protect Aiden from a potentially dangerous situation and left her parental duties unfulfilled. This neglectful lack of action significantly contributed to the child's death.[25]

It should be noted that not all of the acts comprising Layton's "pattern of abuse" were affirmative actions. Layton owed her son a duty of protection.[26] She did not seek help for Aiden

---

[22] State's Br. Supp. Mot. in Limine Ex. 1, p. 14.

[23] State's Br. Supp. Mot. in Limine 7.

[24] State's Br. Supp. Mot. in Limine Ex. 2, p. 18. Specific instances of this behavior will be discussed in a later section of this decision.

[25] 16 *Del. C.* § 903 requires that "any person, agency, organization or entity who knows or in good faith suspects child abuse or neglect shall make a report in accordance with § 904 of this title."

[26] Bryan A. Liang & Wendy L. Macfarlane, *Murder by Omission: Child Abuse and the Passive Parent*, 36 Harv. J. on Legis. 397, 423 (1999) ("A parent's failure to protect a child from abuse constitutes neglect, making the parent as culpable as the abuser. It seems then, that the parent who fails to protect, the accomplice parent, need not share the principal's intent. The intent requirement is satisfied simply by showing the accomplice parent acted 'recklessly' or 'with criminal negligence.' Thus, this statute supports the premise that a parent's omission alone is sufficient to satisfy the intent requirement in child abuse situations due to the high duty of care owed to the child."); Wayne R. LaFave, 1 Subst. Crim. L. § 6.2 (3d ed.) (2017) ("The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons—upon parents to aid their small children…Thus a parent…may be guilty of criminal homicide for failure to call a doctor for his sick child, a mother for failure to prevent the fatal beating of her baby by her lover…Action…may be required to protect against threatened acts by third persons."); *Commonwealth v. Konz*, 450 A.2d 638, 644 (Pa. 1982) ("The inherent dependency of a child upon his parent to obtain medical aid, i.e., the incapacity of a child to evaluate his condition and summon aid by himself, support imposition of such a duty upon the parent."); *People v. Rolon*, 160 Cal.App.4th 1206, 1219 (Cal. Ct. App. 2008) ("We are satisfied that the better rule is that parents have a common law duty to protect their children and may be held criminally liable for failing to do so: a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack."); *Smith v. State*, 408 N.E.2d 614, 620 (Ind. Ct. App. 1980) ("Defendant knew the nature of the situation in which she placed Eric and allowed him to remain, as set forth in the statement of facts. This is sufficient to establish the corpus delicti of the crime of neglect of a dependent."); *State v. Fraga*, 898 N.W.2d 263, 276 (Minn. 2017) ("The State could have drawn on this evidence to show that Fraga engaged in a pattern of child abuse by neglecting the children or, at a minimum, by being indifferent to their continued survival. Because this evidence was relevant

14

after he had been injured and she did not attempt to stop Hundley from harming him. A jury may find her inaction amounts to neglect as contemplated by the statute.[27] Layton's role as the "passive parent" does not excuse her from liability.[28]

*Muehe v. State* is informative. There, the Indiana Court of Appeals reasoned that when a parent is aware of the abuse his or her child is suffering at the hands of the other parent, he or she is under a clear duty to remove the child from the situation and to alert the proper authorities.[29] Given that the victim-child is defenseless, the parent must serve as the child's advocate and owes a high duty of care to the child to ensure that he or she is properly cared for.[30] Therefore, failure to provide sufficient protection is tantamount to neglect.[31]

*Muehe* is relevant to the case at bar because the Delaware General Assembly's use of the word "reckless" in § 634 supports the "premise that a parent's omission alone is sufficient to satisfy the intent requirement in child abuse situations due to the high duty of care owed to the child."[32] Therefore, the State can prove Defendant's reckless state of mind by showing that she did not take appropriate action when she was aware of Aiden's abuse, which resulted in neglect. As a result, any showing that Layton stood by while Aiden was abused or that she did not seek medical attention for him would help prove an element of the offense.[33] Such evidence is admissible at trial.[34]

---

to prove an element of one of the charged offenses, Fraga is incorrect that the evidence was used as inadmissible character evidence under Minn. R. Evid. 404(b).").

[27] Liang, *Murder by Omission* at 423.

[28] *Id.*

[29] *Muehe v. State*, 646 N.E.2d 980, 983 (Ind. Ct. App. 1995).

[30] *Id.*

[31] *Id.*

[32] Liang, *Murder by Omission* at 423.

[33] *Fraga*, 898 N.W.2d at 276.

[34] *Id.*

The facts suggest that Layton had reason to be aware of Hundley's abusive behavior toward Aiden and that she did nothing to help the child. There are at least two blatant occasions where she was aware or should have been aware that Aiden had been mistreated. For one, Layton admitted to seeing the large bump on Aiden's thigh, which was caused by his broken femur.[35] This was a serious physical injury both in pain and duration which affected Aiden's behavior, giving many red flags of abuse. This should have been enough to alert Layton that Aiden was in need of medical attention and that he had been abused. There is no way Aiden could have caused the injury himself and both parents have maintained at all times that they were the only people in contact with Aiden during the period in question.[36] Thus, the only reasonable conclusion to be reached by Layton was that Aiden had suffered abuse at the hands of his father. However, Layton did nothing. She did not seek help from the proper authorities or a medical professional.

Additionally, Layton admitted in her police interview that she witnessed Hundley "slam" Aiden into his bassinet on at least one occasion.[37] Though she later denied it, Defendant stated that when the incident occurred she thought it was possible that Aiden had suffered broken bones as a result of being slammed into the bassinet.[38] Again, the circumstances indicate Layton knew Aiden was suffering but did nothing to help or protect him.

As noted, from Layton's interview with Detective King, it is clear that there were at least two occasions—both violent in nature—where she did nothing to remove Aiden from the harm. Layton did not offer him aid of any kind.[39] Moreover, Defendant knew that during the time she

---

[35]State's Br. Supp. Mot. in Limine Ex. 2, p. 18.

[36] State's Br. Supp. Mot. in Limine 4.

[37] State's Br. Supp. Mot. in Limine Ex. 2, pp. 7, 9, 11.

[38] State's Br. Supp. Mot. in Limine Ex. 2, p. 28.

[39] It is anticipated that Layton will argue the affirmative defense of duress at trial, under 11 *Del. C.* § 431. Representations have been made to the Court that Hundley abused Layton during this time, and that Hundley reacted violently when Layton suggested seeking medical attention or considering protection for Aiden. Thus, it is expected that Layton will argue that a reasonable person would have been unable to resist Hundley's orders not to seek medical care for the child.

was hospitalized for complications from her cesarean section Aiden would be in Hundley's sole care.[40] At this point, she had already witnessed Hundley's ongoing abuse of the baby,[41] yet she did nothing to ensure that Aiden would not be abused during her absence. According to the pertinent statutory definition, this behavior constitutes a pattern of neglect, which consists of two or more incidents where Layton did not properly protect her child. A jury may find this disregard later led to Aiden's death, bringing Layton's behavior into the ambit of § 634.

The Court also notes that Layton's action, or lack thereof, would not have to be the only, or even the primary, cause of Aiden's death. The fact that Hundley committed the abuse that ended Aiden's short life does not excuse Layton from criminality. In *Bullock v. State*, the Delaware Supreme Court held that "[i]n criminal prosecutions, the State need only show a 'but-for' relationship between an action and a result to establish causation. This 'but-for' causation, however, is subject to limitation when the charged conduct is reckless or negligent instead of intentional."[42] This limitation is embodied by 10 *Del. C.* § 263 which instructs that reckless causation is not established if the actual result of the misconduct is outside the risk of which the defendant was aware.[43] Here, there is sufficient evidence for a jury to find Layton knew that Hundley's abuse ran the risk of being deadly. Proper instructions will be given to the jury, and whether Layton possessed a reckless state of mind will ultimately be the jury's determination.

Returning back to the question of whether evidence of this behavior may be introduced at trial, the answer must be in the affirmative. When the evidence sought to be presented will prove an element of the offense charged, it is admissible.[44] If this evidence were being introduced for

---

[40] The medical evidence shows the presence of fresh blood in Aiden's brain and given the aggressive nature of the E. Coli infection, this incident may be found to be close in time to the 911 call. App. Answering Br. Opp'n State's Mot. in Limine B34-B35.

[41] State's Br. Supp. Mot. in Limine Ex. 2, p. 19.

[42] *Bullock v. State*, 775 A.2d 1045, 1049 (Del. 2001).

[43] 10 *Del. C.* § 263.

[44] *Taylor*, 777 A.2d at 764.

17

any purpose other than to prove an element of the offense charged, then the *Getz/Deshields* analysis would be appropriate.[45] However, that is not the case here. The State may introduce evidence of Defendant's prior neglect of her child in order to show that she previously engaged in a pattern of neglect that resulted in Aiden's death. However, only evidence from the time of Aiden's birth forward may be presented to establish that Layton engaged in a pattern of neglect that ultimately resulted in Aiden's death. Acts which occurred while Aiden was in utero are inadmissible for the purpose of proving an element of the crime. Lastly, the Court only highlighted the two most concrete and definite examples of Defendant's neglect. The statutory definition states that a pattern of neglect can be shown by two *or more* instances of neglect. The overall facts of this case make clear that there were multiple acts of neglect that led to Aiden's eventual death, all of which could be presented at trial if sufficient evidence exists to make such a showing.

The evidence of Layton's drug abuse during the time she was pregnant with Aiden would not fall into the previous category of element-proving evidence. Yet, evidence of Layton's drug abuse during her pregnancy or the fact that Aiden was born drug addicted could be admissible for other Rule 404(b) purposes. As a result, the Court now turns to a traditional *Getz/Deshields* analysis. *Getz v. State* laid out the guidelines a court should consider to determine whether evidence of prior bad acts should be admitted under Rule 404(b). Those factors include:

(1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

(2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.

(3) The other crimes must be proved by evidence which is "plain, clear, and conclusive."

---

[45] *Getz v. State*, 538 A.2d 726, 734 (Del. 1988); *Deshields v. State*, 706 A.2d 502, 506-07 (Del. 1998).

18

(4) The other crimes must not be too remote from the charged offense.

(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by Rule 403.

(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by Rule 105.[46]

With respect to the fifth prong of the *Getz* analysis, balancing the probative value of the evidence against its prejudicial effect, an additional nine factors for consideration were specified in *Deshields v. State*. Those factors include:

(1) The extent to which the point to be proved is disputed;

(2) The adequacy of proof of the prior conduct;

(3) The probative force of the evidence;

(4) The proponent's need for the evidence;

(5) The availability of less prejudicial proof;

(6) The inflammatory or prejudicial effect of the evidence;

(7) The similarity of the prior wrong to the charged offense;

(8) The effectiveness of limiting instructions; and

(9) The extent to which the prior act evidence would extend proceedings.[47]

Evidence of Defendant's drug abuse is material to the issue of whether she engaged in a previous pattern of neglect that ultimately resulted in Aiden's death. 10 *Del. C.* § 901(b)(2) includes within the definition of neglect the situation where the person responsible for caring for the child "chronically and severely abuses alcohol or a controlled substance, is not active in

---

[46] *Getz v. State*, 538 A.2d 726, 734 (Del. 1988) (internal citations omitted).
[47] *Deshields v. State*, 706 A.2d 502, 506-07 (Del. 1998) (internal citations omitted).

19

treatment for such abuse, and the abuse threatens the child's ability to receive care necessary for that child's safety and general well-being."[48] Presenting evidence of Defendant's post-natal drug abuse will allow the State to establish that Aiden was neglected as a result of his mother's severe and chronic drug addiction.

On the other hand, demonstrating that Layton used drugs while pregnant with Aiden and the fact that Aiden was born drug addicted will allow the State to show her state of mind immediately prior to Aiden's birth as well as her knowledge that she was not prepared to adequately take care of an infant. It is clearly established by Rule 404(b) that prior bad act evidence may be presented to establish state of mind and knowledge. Further, Hundley stated in his interview with Detective King that Layton used drugs during her pregnancy and that Aiden was born drug addicted.[49] Also, the medical records from Aiden's birth support the assertion that he was born with illegal substances already in his system. Thus, Layton's actions can be proven by plain, clear, and conclusive evidence. Further, these actions took place in the time immediately preceding Aiden's birth. Given that Aiden was born six weeks premature, the period of time in question can only predate the time when the pattern of abuse first started by approximately seven and a half months. Therefore, these actions are not too remote from the time of the charged offense.

The fifth element of the *Getz* analysis requires a greater depth of analysis. Here, the Court does not believe that the probative value of the evidence is outweighed by its unfairly prejudicial effect. The facts that Layton used drugs during her pregnancy and that Aiden was born drug addicted are largely undisputed. There is ample evidence available to support those assertions, which also means that the Court is satisfied by the adequacy of proof of the prior conduct. Moreover, this evidence will have strong probative force. Understanding Layton's state of mind

---

[48] 10 *Del. C.* § 901.
[49] State's Br. Supp. Mot. in Limine Ex. 1, pp. 2, 5.

20

at the time of her pregnancy will aid the jury in understanding how her actions after Aiden's birth constitute a pattern of neglect. There is no less prejudicial proof that will enable the jury to understand Layton's state of mind. Further, the Court does not feel that this evidence is too inflammatory or prejudicial to be introduced at trial. The evidence of drug use prior to Aiden's birth is sufficiently similar to the evidence of murder by neglect to be admissible. Also, the Court is confident that appropriate jury instruction can adequately inform the jury of the limited purpose of this evidence.[50] Finally, there is no risk that presenting this evidence will unreasonably extend the proceedings in this case. For these reasons, the Court believes that admission of this evidence will not contravene Rule 403. Thus, all of the aspects of the *Getz/Deshields* analysis are satisfied, so evidence of Layton's drug abuse during the time she was pregnant with Aiden as well as the fact that Aiden was born drug addicted is admissible under Rule 404(b).

On the other hand, evidence that Layton was aware DFS had opened up a case on her family as a result of Aiden being born drug addicted or that she hid the child from a DFS worker is not admissible under 404(b). These facts are too far removed from the idea that Defendant engaged in a pattern of neglect to be admissible in the State's case-in-chief under Rule 404(b). This would result in unfair prejudice to Defendant, so the evidence will not be allowed.[51]

For these reasons, the State's Motion in Limine to Determine Admissibility Pursuant to Delaware Rules of Evidence is **GRANTED IN PART**.

**IT IS SO ORDERED.**

---

[50] The Court will give an appropriate jury instruction in accordance with Rule 105, which also satisfies the sixth prong of the *Getz* analysis.

[51] The Court notes that this evidence may be admissible for rebuttal purposes, potentially to show why Layton failed to report the abuse to the proper authority or seek appropriate medical attention for Aiden. *Taylor v. State*, 777 A.2d 759, 767 (Del. 2001) (holding that the State may only introduce evidence of the defendant's prior bad acts in its case-in-chief only when that evidence is necessary to prove a part of its *prima facie* case. The State may not prematurely rebut the defendant's defense during its case-in chief. Rebuttal evidence may only be presented after the defense has been advanced by the defendant).